Michael **LEON** and Michael Fuschetti, partners, trading as **West Side Motors, Plaintiffs,**

v.

**CHRYSLER MOTORS CORPORATION,** a Delaware corporation, et al., **Defendants.**

**Civ. A. No. 204–69.**

United States District Court, D. New Jersey.

Feb. 28, 1973.

Beckerman, Franzblau & Cohen by Gary Falkin, Newark, N. J., for plaintiffs.

Shavick, Stern, Schotz, Steiger & Croland by Barry I. Croland, Paterson, N. J., for defendants.

## OPINION

COOLAHAN, District Judge:

Plaintiffs brought this action originally to enjoin certain allegedly discriminatory and anti-competitive trade practices observed by defendant Chrysler Motors Corporation in favor of defendant Newark Chrysler & Plymouth, Inc. As the lawsuit has progressed from its inception in February 1969, however, it has become apparent that the real relief sought by plaintiffs is to dissociate themselves from two advertising associations, composed of New Jersey, New York and Connecticut Chrysler and Plymouth dealer franchises. The New York, New Jersey and Connecticut Plymouth Advertising Association, Inc. (PAA) and New York, New Jersey and Connecticut Chrysler Imperial Dealers Advertising Association, Inc. (CIDAA) were joined as defendants in December 1970. The case has been settled as to defendants Chrysler Motors Corporation and Newark Chrysler & Plymouth, Inc., leaving the PAA and CIDAA as the only parties against whom relief is sought. There exists no dispute as to the relevant facts, and the matter now awaits disposition by the Court upon cross motions for summary judgment under Rule 56, F.Rules Civ.P.

Plaintiff West Side Motors is a partnership having its principal place of business in Newark, New Jersey and has been a franchised Chrysler Motors dealer approximately 35 years. It has negotiated direct dealership agreements with Chrysler Motors Corporation from time to time, most recently in March 1965, for the sale of Chryslers, Plymouths and Imperials. Obviously, plaintiff's management has gone to considerable expense and effort to develop the franchise's good will and reputation within the northern New Jersey consumer community. The description of this case is roughly a history of plaintiffs' struggle to promote and protect that good will and reputation as they see fit.

In or about 1959, both the PAA and CIDAA were incorporated as non-profit membership corporations under the law of New York. These two Associations were formed by franchised Chrysler Motors dealers in New York, New Jersey and Connecticut. Not all dealers participated in the incorporation of the Associations, but virtually all who did not have joined subsequently. Today, there are 160 dealerships in each Association, which the Court understands to represent a vast majority of the total number of franchises existing in the tri-state area serviced by the PAA and CIDAA. West Side Motors entered the PAA in or about June 1961 and the CIDAA in or

about January 1963. All members, of course, are bound by the respective membership agreement of each Association[1], insofar as the provisions therein or any internal legislation of the Associations do not contravene New York law controlling non-profit corporations. The by-laws and membership agreements of the PAA and CIDAA are almost identical.

As one may readily infer from the names of the Associations, their raison d' etre is mass advertising.[2] The benefits of mass advertising as compared to individual advertising were evidently clear to Chrysler Motors dealers throughout New York, New Jersey and Connecticut, as virtually all such franchise holders incorporated or later joined the advertising Associations.

However, until approximately three years ago, individual dealer identification nonetheless found its way into the PAA and CIDAA mass advertising campaigns. This policy caused disputes among the dealers because in some instances, considering the use of mass media such as radio, television, and newspapers, media coverage spread over the territories serviced by scores of dealerships. One could obviously expect quarrels to develop concerning which dealerships were to be individually identified, upon which media, how often and under what circumstances. Further, individualized identification consumed valuable

radio and television time at the expense of product identification. It was some three years ago, therefore, that the PAA and CIDAA Boards of Directors voted[3] to end the advertising practice of individualized dealer identification. The past policy was replaced with a new advertising campaign, based on the slogan "See Your Local Chrysler Dealer."

Shortly thereafter, plaintiffs sued the Chrysler Motors Corporation and Newark Chrysler & Plymouth, Inc., alleging various discriminatory and anti-competitive practices in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22, and 26; and Subsections 2(a), (d), (e), and (f) of the Robinson-Patman Act, 15 U.S.C. § 13(a). The complaint averred that Chrysler had, for whatever reason, given the Newark dealership preferential treatment over West Side Motors. Plaintiffs claimed that Chrysler Motors had delayed delivery of cars, failed to compensate West Side for increased costs in honoring the Chrysler warranty, wrongfully refused credit on auto parts, overcharged for cars delivered, withheld pertinent trade information, refused to carry on normal dealer-manufacturer correspondence, and committed numerous deliberate accounting errors. It was alleged that in all these respects, Newark Chrysler & Plymouth received favored treatment. This aspect of the liti-

1. Paragraph Five of the Agreement between the Direct Dealer and each Association provides: "Direct Dealer agrees to be bound by the by-laws of [the Association] and by any amendments thereto not inconsistent with the provisions of this membership agreement."

2. The purpose of the Associations is stated in the by-laws, Article II, § 2.1(1):
   To foster the material interest of its members in the automobile trade, and in all allied matters, to develop ways and means of meeting market needs, to affiliate and associate with similar groups throughout the country; to attain wider recognition; to encourage free sentiments among its members; to secure for its members the benefits of mass merchandising and advertising

through the medium of associating together on a non-profit basis; to enlighten its members on the latest developments in automobiles; to conduct conferences on promotion and merchandising methods; and to provide means of an interchange of views . . . .

3. Advertising campaigns or practices are matters within the discretion of the Boards of Directors. Article IV, § 4.2 of the by-laws provides:
   *Use of funds.* The funds of the Corporation shall be used to pay for advertising and promotional materials or supplies of such types as shall be determined from time to time by the Board of Directors and for the actual expenses incident to the operations of the Corporation for the purposes aforesaid.

gation, however, has been settled and is not presently before this Court.

Most important for purposes of the action as it presently stands, plaintiffs have alleged that Newark Chrysler & Plymouth, as well as other neighboring competitors, has benefited, to the financial prejudice of West Side Motors, from the new, regionalized advertising program[4] of the PAA and CIDAA. Newark Chrysler & Plymouth, a newly formed, 1968 dealership franchise, is a member of the Associations and pays its pro rata share of dues per the assessment schedule described hereinafter. Nonetheless, plaintiffs contend that their inability to finance their own, individualized advertising has become a severe competitive handicap. Additionally, it has been alleged and conceded that one local competitor is not a member of either the PAA or CIDAA.[5] Thus, plaintiffs allege, advertisement dues assessed against West Side Motors have been used in fact to divert good will and patronage away from it to a nonpaying, unassociated Chrysler-Plymouth dealership.

The assessment and collection of Association dues is governed by the by-laws and membership agreements of the respective groups. The by-laws provide that the dues of each member shall be fixed by the Board of Directors, but shall be no less than $10 and no more than $30 per car sold by the dealer.

The PAA membership agreement sets a contribution of $10 per car. The CIDAA rate was $15 at the time West Side Motors entered the Association in 1963, but has subsequently risen to $20 per car, effective January 1, 1971. Both agreements recite the belief that "it will be more convenient . . . if [the Association] authorizes Chrysler Motors Corporation to collect from Direct Dealer and transmit to [the Association] the amount due . . . ." Therefore, the PAA and CIDAA receive payment of dues from the manufacturer, Chrysler Motors, which simply adds the amount onto the invoice delivered to the dealer.

There is also an arrangement by which dealers, and ultimately the PAA and CIDAA, are reimbursed by Chrysler Motors Corporation for advertisements identifying local dealers. After a dealership has joined either the PAA or the CIDAA, it then executes a reimbursement agreement with Chrysler Motors Corporation, which agrees to pay the dealership up to $5 for every Plymouth[6] and up to $15 for every Chrysler or Imperial sold, contingent upon satisfactory proof of such advertising expenditures and continued payments by the dealership to the PAA and CIDAA. The dealership assigns to the PAA and CIDAA its right to receive such reimbursement and directs the manufacturer to pay such amounts over to the Associations in the name of the dealership. The manu-

4. In the past, area billboards included the names of nearby Association dealers. Following the decision by the respective Boards of Directors, however, dealership names were deleted from the signs in favor of the "See Your Local Chrysler Dealer" legend. On July 10, 1969, Michael Leon wrote to A. M. Augustine, then president of both the PAA and CIDAA, advising him that West Side Motors had ordered the billboard advertising service to delete its name from all recently posted advertisements. For the purposes of summary judgment, the Court interprets that action as a step in disavowing any obligation to or connection with either the PAA or CIDAA, and not as an opinion on the merits of individualized dealership advertising.

5. The nonmember owns a franchise in Belleville, New Jersey, a Newark suburb. The Belleville dealership is a member of the New York Valiant Advertising Association, which in 1961 was absorbed into the PAA. The dealership in question declined to accept the expanded coverage and continues to be assessed only for Valiants. Whether or not there exist other nonmember Plymouth-Chrysler dealerships is uncertain, but the Court may fairly assume that plaintiffs have uncovered all nonmembers in competition with West Side Motors.

6. Payments for Plymouth advertising may be increased to $10 according to a sliding scale adjusted to the dues charged by the PAA.

facturer retains the right to terminate the agreement ninety days after giving notice.

Because of the proximity of a non-Association competitor and plaintiffs' thorough dissatisfaction with the PAA and CIDAA advertising campaigns, West Side Motors resolved to sever its connections with both Associations. On November 7, 1968, Michael Leon, a partner of West Side Motors, mailed a letter to the CIDAA advising that as of December 1, 1968 "we no longer want to be a member of the CIDAA Assessment Group. We therefore do not want to be charged $15.00 for advertising on our invoices." An identical message was sent to the PAA. And the following day, both Associations were notified that as of the termination date, West Side Motors did not wish to be included in any newspaper or poster advertising. Mr. A. M. Augustine, president of both the PAA and CIDAA, presented Leon's letters to the Boards of Directors at their regular monthly meetings in mid-December 1968, but apparently the Directors did not treat those rather cryptic messages as a formal request for voluntary withdrawal as provided for in the by-laws. These provisions are crucial to the resolution of this litigation.

According to Article III, Section 3.2 of the by-laws, each member agrees not to withdraw from the Association without the consent of a majority of all members. Section 3.4 provides that membership in the Association ceases upon termination of the dealership franchise. Short of that, only dissolution of the Association will terminate membership in the Association as well as the obligation to pay advertising assessments. These rules are also included in the membership agreement,[7] by which the dealer agrees to be bound by the by-laws of the Association and by any amendments thereto not inconsistent with the provisions of the membership agreement.[8] Unless a majority of Association members can be persuaded to vote against their economic interests, each member is, practically speaking, locked into the Association perpetually.

It is obvious that the Boards of Directors regarded Leon's notice of severance as something less than an effective request for a vote upon its voluntary withdrawal in accordance with Article III, Section 3.2 of the by-laws.[9] Augustine was instructed by the Boards to inform Leon of the formal procedure set out in the by-laws for voluntary withdrawal, but he did not do so until mid-January

---

7. Paragraph Five of the membership agreement states:

In consideration of all other members similarly agreeing, Direct Dealer agrees not to withdraw from membership in [the Association] except with the consent of a majority of its members or in case of dissolution of [the Association]; however, this membership agreement will terminate automatically on termination of the Direct Dealer Agreement under which Direct Dealer purchases new . . . passenger cars from Chrysler Motors Corporation.

8. Paragraph Six, Membership Agreement, PAA and CIDAA.

9. The Boards of Directors could not have acted alone on a properly prepared application for withdrawal in any event, as Article III, Section 3.2 represents the exclusive procedure for effecting a voluntary withdrawal from the Association. It may have been treated as a request to place the matter on the agenda of the annual meetings of the Associations, which are held between June 1st and July 31st each year. However, West Side Motors has consistently taken the position that it may effectuate its withdrawal unilaterally and the Associations have just as stubbornly stood on formality by declining to regard West Side Motors' "resignation" as at least a request for consideration of the matter by the general membership. It was not until September 10, 1971 that plaintiffs' attorney made a formal application for such consideration, without prejudice to West Side Motors' right, if any, to withdraw unilaterally.

Additionally, Article V, § 5.2 of the by-laws provides that a special meeting may be called at any time for any purpose upon written request of twenty-five members.

1969, and then, only in response to a letter from Leon's attorney stating that West Side Motors considered itself withdrawn from the Associations, would not pay further assessments, and would deal appropriately with "further attempts to indulge in economic coercion." Augustine's correspondence simply restated the withdrawal provisions of the by-laws. Three times subsequent to this exchange of letters, Augustine wrote to Leon to inform him of advertising campaigns. On January 22 and July 1, 1969, Augustine wrote Leon to advise him that the Boards of Directors had authorized numerous billboard advertising campaigns in the West Side Motors vicinity. These letters stated the proposed billboard sites and advised Leon that each billboard would identify West Side Motors as a local dealer. As previously noted, Leon then informed Augustine on July 10, 1969 that West Side Motors did not desire to belong to either Association, to participate in any advertising or promotional program, or to have its name carried on any billboard advertising sponsored by the PAA or CIDAA. Augustine responded by letter of July 14, 1969 that the Associations would, as they must, accede to West Side Motors' refusal to participate in further advertising campaigns, but that West Side Motors would continue as a member of the PAA and CIDAA until the voluntary withdrawal machinery of Article III, Section 3.2 had been cranked into action. Except for the letter mailed by plaintiffs' attorney on September 10, 1971 to comply with this procedural formality, there has been apparently no other relevant action taken by the parties to date.

In their cross-motion for summary judgment, defendants present a threshold procedural question. They argue that any action to dissolve the corporate affiliations is premature until plaintiffs have exhausted intracorporate remedies, that is, until the plaintiffs' formal request for a vote upon voluntary withdrawal has been acted upon this June or July at the respective annual meetings. Naturally, New York corporation law governs the disposition of all arguments herein.

■ While it is clear that a vote in favor of West Side Motors' withdrawal from the Associations would be a vote against economic self-interest, the Court may not indulge in the speculation that this alone renders the remedy within Article III, Section 3.2 illusory. Where intracorporate machinery exists for the resolution of internal disputes, the courts may only inquire whether such procedures comport with due process and are fairly and honestly administered. In Lafond v. Deems, 81 N.Y. 507 (1880), certain social club members sued to dissolve their association because of internal dissension, allegedly caused by the violation of club rules. The constitution and by-laws of the club, however, provided procedures for trying offenders upon charges preferred by fellow members. The court therefore declined jurisdiction over the case. The court ruled:

As the members who are claimed by the plaintiffs to have been chargeable with a violation of the rules of the association were not called upon to answer, so as to correct the evils complained of, and as the power to remedy the same was ample and complete, the plaintiffs are not in a position to seek the interposition of a court of equity. Courts should not, as a general rule, interfere with the contentions and quarrels of voluntary associations, so long as the government is fairly and honestly administered, and those who have grievances should be required in the first instance to resort to the remedies for redress provided by their rules and regulations. This had not been done in the case considered, and under such circumstances no action lies.

*Id.* at 514 (citations omitted). *Accord,* Cabana v. Holstein-Friesan Ass'n of America, 196 App.Div. 842, 188 N.Y.S. 277 (4th Dep't 1921), aff'd, 233 N.Y. 644, 135 N.E. 953 (1922); Moyse v. New York Cotton Exchange, 143 App.

Div. 265, 128 N.Y.S. 112 (1st Dep't 1911).

■ Plaintiffs have in fact substantially exhausted intracorporate remedies under the voluntary withdrawal provision of Article III, Section 3.2. That provision simply states that a majority of Association members must accede to another member's withdrawal for it to be effective. It does not state the manner in which the request must be placed on the agenda of the annual meeting. No formal declaration of intent or petition is required. The yearly meeting provision of Article V, Section 5.1 simply states that there shall be an annual meeting for the election of directors and "for the transaction of such other business as may properly come before such meeting . . . ." Nowhere is there a suggestion that members must formally notify the secretary to have a particular matter placed on the Association's agenda. The Court believes that when Leon wrote Augustine on November 7, 1968 that "we no longer want to be a member of the [Associations]," he was in effect invoking the voluntary withdrawal procedure of Article III, Section 3.2. Admittedly, Leon never put that construction upon his action, because it has been the position of West Side Motors throughout this dispute that withdrawal could be effected unilaterally, regardless of Association sentiment or its by-laws. However, the Court views Augustine's refusal to have the membership consider anything less than a formal request for withdrawal as no less intransigent. Quite obviously, Augustine thought that West Side Motors' sudden and rather unceremonious retreat from the PAA and CIDAA was an affront, if not a threat, to those organizations. He brought the matter to the attention of the Boards of Directors immediately after receiving Leon's letter of November 7, 1968. There is nothing to indicate why the matter could not have been added to the agenda of the annual meetings and resolved by the entire membership. The fact that Augustine regarded West Side Motors' secession as detrimental to the welfare of the Associations did not lessen his fiduciary duty to that particular member of the Associations to effectuate, by good faith, practical minded efforts, the right of voluntary withdrawal offered by Article III, Section 3.2 of the by-laws.[10] He failed to do so, and the Associations, by virtue of the inaction of their duly elected president, are estopped from asserting that plaintiffs have not yet exhausted intracorporate remedies.

■ We now move to the merits of this case, which involve an attack upon the validity and enforceability of Article III, Section 3.2 of the Associations' by-laws, by which voluntary withdrawal from the Associations is conditioned upon majority membership consent. Plaintiffs ask the Court to void this provision as an arbitrary and unreasonable restraint upon what they regard as a right to dissociate themselves from a corporation when the benefits inuring thereto are so slight that they can no longer justify the burdensome expense of corporate membership. As further relief, plaintiffs ask that all assessments taxed after December 1, 1968 be returned.[11] The defendant Associations reply that the "right" asserted is noth-

10. Under Article VII, § 7.1 of the by-laws, the president has broad discretion to control and manage the business of the Associations. As previously noted, Augustine is the president of both the PAA and CIDAA. Judging from the materials presented to the Court, it is apparent that Augustine was more than just a steadying hand upon the corporate rudder. The facts presented in this case do not paint a portrait of a timid or cautious executive, but rather an officer who is familiar with the exercise of authority and quite competent to do so. A realistic appraisal of the corporate relationships involved and the nature of the defendant Associations bolster the Court's conclusion that the West Side Motors dispute should have been brought to the attention of the general membership.

11. From December 1, 1968 (the date plaintiffs regard as the effective date of withdrawal) to August 15, 1971, West Side

ing more than the right to repudiate solemn contractual undertakings. The Court agrees that there is nothing so onerous or unconscionable about Article III, Section 3.2 as to require its invalidation.

■■ The PAA and CIDAA are creatures of the New York Not-For-Profit Corporation Law, McKinney's Consol. Laws, c. 35. Recently enacted as N.Y. Sess.Laws 1969, c. 1066, as amended, L. 1970, c. 847, the new law governs the activity of all New York corporations whose exclusive purpose is not for pecuniary profit or financial gain.[12] New York Not-For-Profit Corporation Law Section 602(f) (McKinney's 1970) provides with respect to the propriety of adopted by-laws:

*The by-laws may contain any provision relating to* the business of the corporation, the conduct of its affairs, its rights or powers *or the rights and powers of its members,* directors or

officers, not inconsistent with this chapter or any other statute of this state or the certificate of incorporation.

(Emphasis added). There is prima facie validity, therefore, to any provision of a not-for-profit New York corporation restricting the right of a member to withdraw voluntarily. Termination of membership is governed more explicitly by Section 601(e), which states:

Except as otherwise provided in this chapter or the certificate of incorporation or the by-laws, membership shall be terminated by death, resignation, expulsion, expiration of a term of membership or dissolution and liquidation under articles 10 and 11.

Section 601(e) lends support to the conclusion that, except in extraordinary cases, members are to be bound by the by-laws regarding termination of membership. The unequivocal language of

---

Motors has contributed $16,990.00 to the PAA and CIDAA. The membership agreement and by-laws further provide for the refund of dues attributable to the sale of "fleet cars."

Article IV, § 4.3 of the by-laws reads:

Refunds. When Plymouth cars have been purchased by a member specifically for delivery as a bonafide government, municipal, taxi or fleet purchase—said fleet purchase being defined as a sale to a purchaser who appears in the Chrysler Motors Corporation Fleet Department and/or R. L. Polk & Co. lists of qualified fleet accounts and who purchases in one calendar year five or more vehicles of whatever make—the dues attributable to such cars shall be returned to the member upon receipt from such member of an application for reimbursement on the form designated or approved by the Corporation. All such claims for refund must be filed with the Treasurer of the Corporation within 90 days after the date of delivery of the subject cars to the qualified buyer, and any such claims filed thereafter shall not be allowed.

Plaintiffs claim a rebate of $5,680.00 for fleet car sales is due them. Apparently, however, they have not complied with the 90 day notice provisions of Article IV, § 4.3, and no request for refunds had been

made during the period in question until September, 1971. As with the billboard dispute, the failure to comply with the by-laws is properly interpreted as a refusal to recognize the very existence of the Associations or legitimize their actions.

12. New York Not-For-Profit Corporation Law § 102(a)(5). The test for inclusion under § 102(a)(5) is whether any part of the corporate assets or income is distributed or inures to the benefit of corporate members or officers. The section also provides that corporations predating the enactment of N.Y.Sess.Laws 1969, c. 1066, as amended, L.1970, c. 847, are governed by the new law. Therefore, the Court need not consider at length the earlier provisions of the New York Membership Corporations Law §§ 20, 40, repealed, N.Y.Sess.Laws 1969, c. 1066, as amended, L.1970, c. 847 (eff. September 1, 1970). Old § 40 provided that corporate membership continued until terminated by death, resignation, or otherwise, while § 20 allowed corporations to enact by-laws, not inconsistent with law or its certificate of incorporation, providing for voluntary withdrawal. The power to regulate the "rights and powers" of corporate members under § 602(f) of the New York Not-For-Profit Corporation Law is, if anything, a liberalization of analogous powers under the older enactments.

these provisions compels the conclusion that New York has determined that nonprofit corporate associations such as the PAA and CIDAA are to be given the utmost latitude in the regulation and management of their intracorporate affairs.

▮▮ Only the most abusive and obnoxious by-law provision could properly invite a court's intrusion into what is essentially a business thicket. Ordinarily, the contracting parties, not the courts, must weigh and evaluate the wisdom of their corporate agreements and regulations. Having voluntarily submitted to the rule of the corporate majority, all members are thereby bound and are barred from seeking judicial redress unless the corporate rule or action complained of contravenes the certificate of incorporation, New York law or a strong public policy of that state. In re Haebler v. New York Produce Exchange, 149 N.Y. 414, 44 N.E. 87 (1896); People ex rel. Gray v. Erie County Medical Society, 24 Barb. 570 (1857); Cabana v. Holstein-Friesian Association of America, 196 App.Div. 842, 188 N.Y.S. 277 (4th Dep't 1921), aff'd, 233 N.Y. 644, 135 N.E. 953 (1922); Associated General Contractors of America v. Lapardo Brothers Excavation Contractors, Inc., 43 Misc.2d 825, 252 N.Y.S.2d 486 (Sup. Ct.1964); Stein v. Marks, 44 Misc. 140, 89 N.Y.S. 921 (Sup.Ct.1904).

Plaintiffs cite several New York cases to support their contention that Article III, Section 3.2 of the by-laws should not be given judicial sanction. We begin our examination with Ewald v. Medical Society of New York County, 144 App. Div. 82, 128 N.Y.S. 886 (1st Dep't 1911). Plaintiff was a member of a medical society who had been suspended for making a professional misrepresentation. While under the order of suspension, additional charges for falsification were preferred against plaintiff, who was restored to active membership by the society for the purpose of trial upon the new charges and probable expulsion from membership. When plaintiff received notice of his restoration, he promptly resigned. The society, however, rejected his resignation, citing a by-law provision which disallowed resignation by any member against whom there were pending charges. The court agreed with the society that the ability to discipline its members would be rendered inoperative if a member guilty of misconduct could escape proper discipline by the simple expedient of resigning.

In People ex rel. Hass v. New York Motor Boat Club, 70 Misc. 603, 129 N. Y.S. 365 (Sup.Ct.1911), the sole limitation upon the right of a member of the club to resign was indebtedness to the club. Plaintiff had tendered his written resignation, but the club board of directors adopted a resolution urging him to reconsider his resignation. Plaintiff then withdrew his resignation, but the board and the club membership subsequently voted to approve the resignation. Plaintiff sued for reinstatement into the club, but the court ruled that once plaintiff had submitted his resignation, acceptance by the club was a perfunctory act so that resignation was effective immediately upon submission. Only nonpayment of dues, said the court, could have presented the club with a discretionary consideration, but plaintiff was not in arrears. Therefore, nothing could forestall the effectiveness of plaintiff's resignation once tendered. By implication, of course, the court was of the opinion that club indebtedness was a valid reason for disallowing voluntary withdrawal from the club. A similar proviso against withdrawal by a member indebted to the organization was upheld in Associated General Contractors of America, Inc. v. Lapardo Brothers Excavation Contractors, Inc., 43 Misc. 825, 252 N.Y.S.2d 486 (Sup.Ct.1964).

Plaintiffs contend that this trilogy of New York cases demonstrates the necessity of adequate standards for permitting voluntary withdrawal from nonprofit corporations. But the postulating of "standards" carries with it the suggestion of a "right" to withdraw voluntarily, created ex nihilo, capable only of a vague description, and ostensibly hav-

ing no ascertainable source in the law. The only rights existing in these cases were those created by the private law of the parties, insofar as such contract rights did not exceed statutory bounds or conscionable reaches. Plaintiffs do not, as they cannot, urge the invalidity of Article III, Section 3.2 on the ground that it contravenes the New York Not-For-Profit Corporation Law. The Court's only task, therefore, is to inquire whether the hardship imposed by this provision is unconscionably disproportionate to the benefit derived by the corporate whole through its enforcement. And in all these cases, the courts must take into account the purpose of the corporation as well as the purpose of the challenged provision and alternative, fairer means by which that purpose may have been achieved. Seen in this light, the New York cases cited by plaintiff do not offer standards for voluntary withdrawal, as "standards" implies a pre-existing right, but instead uphold substantial limitations upon a right to terminate membership which is otherwise guaranteed by the by-laws of the corporation. See also Associated Press v. Emmett, 45 F.Supp. 907 (S.D.Cal.1942); Haynes v. Annandale Golf Club, 4 Cal.2d 28, 47 P.2d 470 (1935).[13]

The purpose of the PAA and the CIDAA is clearly stated in the by-laws, Article II, Section 2.1, quoted heretofor. The benefits of mass advertising as opposed to individual efforts are so self-evident that it would be purposelsss to explore them. These advantages were just as obvious to the 160 Chrysler and Plymouth dealers in the New York, New Jersey and Connecticut area during the early years they coalesced to form the PAA and CIDAA. Nor does the Court feel compelled to belabor the obvious fact that the promise of each to join was an incentive for all to assent to mutual cooperation. Indeed, it was a powerful incentive, as any nonassociating dealer would reap the harvest of the Associations' labors without shouldering his fair share of the costs. The same would be equally true of those who joined but later seceded. To prevent a potential floodtide of withdrawals the Associations adopted Article III, Section 3.2. Although no standards for obtaining permission by a majority for voluntary withdrawal are enunciated, it is hard to imagine what inequitable development would justify such action by the membership. The contribution of each dealer is contingent upon his sales, which presumably bear at least a reasonable

13. Plaintiffs offer these two California cases for the Court's consideration as persuasive authority for their argument that New York requires that standards be adopted by which corporate members may resign. In *Haynes, supra,* a club's by-laws stated that a resignation was not effective until accepted by the Board of Directors, which must first conclude that no back dues were owing and that the membership certificate had been returned to the club. The Directors withheld consent to plaintiff's resignation and refused to make the appropriate book entries. The court held that the Directors had no right to force "perpetual membership" upon the plaintiff, and that insofar as the by-laws authorized the Directors to reject a resignation for no reason whatsoever, they were arbitrary, unreasonable and hence invalid. However, the court did not speak of "standards" which must exist for voluntary withdrawal, but rather of "just terms" which might be imposed upon a resignee. It is

obviously just that a member who owes nothing to an association and who seeks to disavow its benefits should have a means to resign therefrom. Even by good faith endeavor, nevertheless, plaintiffs in the instant case simply cannot dissociate themselves from the benefits accruing to all Chrysler-Plymouth dealerships in the tri-state area.

The defendant in *Associated Press, supra,* was a member of that news gathering agency, who sued for back dues which became payable immediately upon his refusal to pay for AP services. Defendant had declined further payment when he resigned from the agency. However, the by-laws stated that membership could be terminated only by two years' notice. In upholding the two-year waiting provision, the court gave great weight to the benefits of the AP service defendant would receive during the waiting period. At the end of that time, of course, benefits and membership would terminate simultaneously.

relationship to the advertising conducted by the Associations. Moreover, if a dealer were permitted to withdraw, it would be impossible to deny him the mass advertising benefits enjoyed by the remaining members. True, a nonassociated neighboring franchise presently profits by the regional advertising of the Associations without contributing a pro rata share toward its expense. But plaintiffs' withdrawal would only enlarge, perhaps double, the number of nonassociated Chrysler-Plymouth dealers. The potential domino effect is obvious. And each dealer could legitimately forward the same arguments in favor of withdrawal as those offered now. In essence, plaintiffs are trapped in the illogic of arguing that the free advertising benefits available to any unassociated competitor(s) are substantial enough to justify plaintiffs' withdrawal, but the benefits enjoyed by plaintiffs are too remote and speculative to prevent withdrawal. Certainly, both propositions cannot stand at once.

A single New York case is closely in point, as it demonstrates that those who voluntarily bind themselves perpetually to a project of mutual benefit and cooperation cannot disavow their contractual obligation to other members of their association, especially where the benefits necessarily continue after participation has otherwise ended. In Troy Iron and Nail Factory v. Corning, 45 Barb. 231 (N.Y.1864), members of the Wyant's Kill Improvement Association sued to recover dues assessed against nonpaying members. The Association was a trust founded for the improvement of a stream by increasing head water and regulating its flow for the supply of bordering mills and other establishments. The articles of association provided that members could resign only by terminating ownership and occupation of the land along the stream. The defendant nonpaying member claimed that he was dissatisfied with the benefits of the improvements made, and objected specifically to the purchase of a large lake upstream. The court refused to substitute its judgment for that of the contracting parties as to the value of the bargain struck by the members at the inception of the corporation. The court observed the obvious inequity in allowing secession from the Association if improvement benefits could not practically be discontinued:

> They had no right voluntarily to abandon the association and refuse to perform the duties and obligations imposed upon them, and they could only relieve themselves from the contract they had entered into by a sale of their property.

. . . . . .

> I am at a loss to determine how this court upon any well established principle can interfere with [the assessment scheme], or readjust the apportionment already made, or relieve the parties from the obligations which the award and their solemn agreement have imposed upon them.

. . . . . .

> Nor do I think that defendants can be allowed to withdraw as members of the association. Although the defendants have not of late enjoyed the full benefit of their improvements, and have refused to participate further in the transactions and business of the association, and have sought to abandon their connection with it, they can not be permitted thus to exonerate themselves from responsibility. If the court had the power to adjudge that they might in this way dissolve their relationship and be discharged from further duties and obligations as members, it would be a question for grave consideration, exceedingly difficult to determine, upon what terms and conditions such a withdrawal would be tolerated and allowed. It would be impossible, as a condition to withdrawal, to deprive them entirely of the use of the water power which had been largely increased and furnished them by the improvements made by the association, and utterly impracticable to restore the parties to the precise condition of affairs, and to

the same equitable footing which they relatively occupied before the improvements were made by the association. The effect of any such withdrawal would inevitably impose additional [burdens] upon the remaining associates, while the defendants would continue to use and enjoy the privileges conferred, if not as much as formerly, yet to the extent which they desired. No rules of compensation could well be provided and established for such a contingency. As the parties are situated, at the present time, I am not conscious of any just and fair mode by which the court can permit any of the members of the association to withdraw, and do even handed and exact justice and equity to all the parties. And although there may be some hardship in compelling the defendants to contribute, yet I think no case for the affirmative relief asked for by defendants is made out, and no such relief authorized by law.

*Id.* at 243–244, 255–257. It would be difficult to imagine a more analogous factual situation and a more thoughtful, careful resolution of the competing hardships in cases of this nature. The decision necessarily controls the result here.

Nor can the *Corning* decision be slighted as an outdated relic from an age in which contracts were enforced with an iron hand. Quite recently New York courts have upheld assessments levied by community development and maintenance corporations against nonmembers of the corporation owning land within the community. These corporations, commonly initiated by the community developer, are responsible for the building and maintenance of community facilities shared by all, such as streets, sewer systems, recreation areas, and the like. Courts have ruled that implicit in the agreement to purchase land within a community serviced by such a corporation is a promise to pay assessments imposed by the corporation, whether the given landowner has explicitly consented to corporate membership or not. Premium Point Co. v. Emigrant Industrial Savings Bank, 265 App.Div. 1056, 39 N.Y.S.2d 490 (2d Dep't 1943), aff'd, 291 N.Y. 813, 53 N.E.2d 575 (1944); Tomkins Lakes Estates Association v. Speisman, 51 Misc.2d 488, 273 N.Y.S.2d 457 (Sup.Ct.1966); Sea Gate Association v. Fleischer, 211 N.Y.S.2d 767 (Sup.Ct. 1960). Clearly, it is more far reaching to impose quasicontractual liability for corporate benefits received by a nonmember than to bind a member, who cannot dissociate himself from such benefits, to his original agreement to accept assessments.

Plaintiffs do not seriously contend that any portion of the Membership Agreement or by-laws is unconscionable, nor have they ever contended that their decision to join the PAA and CIDAA was the product of a factual mistake regarding the nature of the Associations, the dues to be assessed, the method of assessment, the procedure by which promotional and advertising decisions would be made, the potential of nonmembership competition, or similar items of substance. While delivery of cars of Chrysler Motors Corporation is contingent upon payment of assessed dues, plaintiffs have never alleged that their decision to join the PAA and CIDAA was coerced by the parent corporation. In short, plaintiffs are unable to cite a single reason, cognizable in law or equity, why the Court should extinguish their voluntarily incurred contractual obligation. That obligation may not now be dishonored simply because plaintiffs have become convinced they made a poor bargain.

As there appears to be no dispute regarding the relevant facts in this case, an order for summary judgment upon defendants' cross motion will be entered accordingly.

Let an appropriate order be submitted.