228 N.J. Super. 437 (1988)
550 A.2d 154
LARRY S. LOIGMAN PLAINTIFF-APPELLANT,
v.
RAYMOND R. TROMBADORE; JAMES C. PITNEY AND NEW JERSEY STATE BAR ASSOCIATION, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued April 12, 1988.
Decided October 21, 1988.
*438 Before Judges ANTELL, DEIGHAN and R.S. COHEN.
*439 Larry S. Loigman, attorney, argued the cause pro se (Larry S. Loigman on the brief).
William B. McGuire argued the cause for respondents Raymond Trombadore, James C. Pitney and New Jersey State Bar Association (Tompkins, McGuire & Wachenfeld, attorneys).
Carton, Nary, Witt & Arvanitis, attorneys for respondents Raymond Trombadore, James C. Pitney and New Jersey State Bar Association.
William B. McGuire and Marianne M. DeMarco of the firm Tompkins, McGuire & Wachenfeld and Robert R. Witt of the firm Carton, Nary, Witt & Arvanitis filed a joint brief on behalf of the respondents.
The opinion of the court was delivered by DEIGHAN, J.A.D.
Plaintiff Larry S. Loigman appeals from a dismissal of his complaint against the New Jersey Bar Association (Association), Raymond Trombadore, immediate past-president of the Association and past chairperson of the Association's Judicial and County Prosecutor's Appointments Committee (Appointments Committee), and James C. Pitney, chairperson of the Committee during Trombadore's term as Association president. Plaintiff's complaint alleged that the defendants wrongfully influenced the governor with regard to certain prospective nominees to the judiciary. Plaintiff sought to enjoin defendants from advising the governor concerning judicial qualifications of judicial appointees. He also sought compensatory and punitive damages. Prior to filing an answer, the defendants' motion to dismiss the complaint on the ground that it failed to state a claim for relief under R. 4:6-2(e) was granted.
In his complaint, plaintiff averred that the Association, through its officials, over the years has "attempted to exercise a form of power or control over the decisions of the Governor ... with regard to the nomination of persons to the judiciary." He then claimed that "[d]uring [their] incumbency, [the individual] Defendants [have] purposefully presented to the public the *440 improper appearance that each has, and has attempted to exercise, such putative form of power or control" and have "led the good and honest citizens of the State of New Jersey to believe that the governor has corruptly surrendered his constitutional authority to them ... in derogation of the New Jersey Constitution (1947), Art. VI, § 6, ¶ 1." He then charged that defendants have "caused the Governor to be subject to influence by false, misleading, fraudulent and malicious statements" and have "purposely, intentionally, deliberately, and with fraudulent intent, concealed relevant and material information regarding the nomination of persons to the judiciary."
He then asserted that the defendants, "by the use of secret documents containing rumor, innuendo, gossip and similar scandalous matter, attempted to thwart, pervert or subvert the democratic institutions of government in this State." In so doing, he asserted, defendants "combined, conspired and confederated together ... to cheat, defraud and deprive plaintiff, and the other members of Defendant Association of the rights and privileges of membership therein." In particular he charged that the defendants, in the summer of 1986, "used without proper authority, and ... with intention to deceive, with regard to the proposed nomination of one P.D.C. (said initials having been substituted herein for the full name of the actual person) to the judiciary" and that the activities of defendants have caused "grievous injury to Plaintiff, and all other residents, citizens and taxpayers of the State of New Jersey and all other members of Defendant Association."
Basically, plaintiff complained of the procedure by which the governor solicits and receives recommendations from the Association. This procedure began during the term of Governor Alfred E. Driscoll and was formalized by a written compact in 1969 by Governor Richard J. Hughes.[1] Governor William T. *441 Cahill, honoring his campaign commitment, continued the arrangement during his term of office after which he endorsed a new proposal to expand and strengthen this arrangement. See Governor Supports State Bar Judicial Selection Plan, 96 N.J.L.J. 1237 (1973); New Procedures Adopted For Judicial Nominations, 92 N.J.L.J. 657 (1969).
Plaintiff then demanded judgment, among other things:
1. Enjoining and restraining Defendants from exercising, ... any form of power or control over the decision of the Governor with regard to the nomination of any person to the judiciary; and
2. Enjoining and restraining Defendants from communicating to the Governor any opinion with regard to the nomination of any person to the judiciary, unless such communication shall first have been approved by each member of Defendant Association; . .. .
Before the trial court, plaintiff argued that:
MR. LOIGMAN: There is quiet [sic] a difference between John Jones going in and saying to the Governor, I feel that you should sign this bill. I feel that so and so should be nom  quite a difference between that and an organization composed of thousands of people saying in the name of this organization we tell you to do thus and such. We haven't consulted with our members about this, they never authorized us to give this opinion, we are not even going to tell them what this opinion is. Its a secret even from them, but in the name of twenty thousand people we are going to tell the Governor what to do.
On September 15, 1987, Judge Wichmann dismissed the complaint on the basis that it involved a political question and thus presented a non-justiciable issue. Judge Wichmann noted that,
Who the Governor solicits advice from regarding judicial nominations, and what passes between them, is private and is not the province of the judiciary to interfere.
The Governor is free to take such advice or disregard it, and the Court takes notice that he accepts input from many persons and organizations who do not always agree among themselves.
If the plaintiff is unhappy with the process or the results generated, his redress is with the Legislature, or perhaps the pressure of public opinion, or within the Association, and not through the courts.
On appeal before us plaintiff contends that the complaint properly sought relief against a voluntary association and presented a justiciable issue.

*442 I
The issue of the justiciability of a political question involves consideration of the constitutional separation of powers between the respective branches of government. Article III, Paragraph I of the New Jersey Constitution provides:
The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
The purpose of this provision is to safeguard the "essential integrity" of each branch of government. Gilbert v. Gladden, 87 N.J. 275, 281 (1981); see Massett Building Co. v. Bennett, 4 N.J. 53, 57 (1950).
"The nonjusticiability of a political question is primarily a function of the separation of powers." Baker v. Carr, 369 U.S. 186, 210 82 S.Ct. 691, 706, 7 L.Ed.2d 663, 682 (1962). Accord, Gilbert, 87 N.J. at 281. Determining whether a matter presents a non-justiciable political question requires engaging in a "delicate exercise in constitutional interpretation." Id. at 282. In Baker, Justice Brennan articulated the criteria for determining the identification of a political question:
Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution with expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.
Baker, supra, 369 U.S. at 217, 82 S.Ct. at 710, 7 L.Ed. 2d at 686; accord, Gilbert, 87 N.J. at 282. To justify a dismissal based on nonjusticiability, only one of these criteria need be inextricable from the facts and circumstances presented before the court. Ibid.
The first criterion in Baker concerns "a textually demonstrable constitutional commitment of the issue to a coordinate *443 political department." The power to nominate and appoint judges is expressly vested in the Governor and Legislature under Article VI, § VI, Paragraph 1 of the New Jersey Constitution:
The Governor shall nominate and appoint, with the advice and consent of the Senate, the Chief Justice and associate justices of the Supreme Court, [and] the Judges of the Superior Court....
This provision does not impose any restriction upon the Governor concerning the sources of information he may choose in considering a nominee to the judiciary. Hence, there is no authority by which a court may restrict the Governor's access to information. By restraining the Association from communicating with the Governor concerning qualifications of judicial candidates, plaintiff attempts to foreclose the Governor from eliciting information from one of the most logical sources concerning the qualification of nominees to the bench.
The second criterion listed in Baker applies where there is a "lack of judicially discoverable and manageable standards for resolving" the issue before the court. In Passaic County Bar Assn. v. Hughes, 108 N.J. Super. 161 (Ch.Div. 1969), which involved a challenge to the practice of "senatorial courtesy" concerning judicial nominees, the court found such standards to be lacking. Judge (later Justice) Mountain wrote:
How is a judicial inquiry to be undertaken to find out whether, in fact, inaction on the part of the Senate results from a deference to the tradition and practice of senatorial courtesy or from some other cause? Are senators to be interrogated as to the reasons and motivations for their actions or their inactions?
Id. at 173. Here the question is: How can a court infringe upon the right of the Governor, in the performance of his duties, to seek information from the Association concerning qualifications of potential candidates for appointment to the judiciary?
The third criterion from Baker applies when a court confronts "the impossibility of deciding a case without an initial policy determination of a kind clearly for nonjudicial discretion." This case certainly falls under this criterion. It has never been the policy of our courts to attempt to restrict the *444 Governor or the Legislature concerning the sources of advice from which they may draw for information to assist in the performance of their duties. Governors Driscoll and Hughes formulated and adopted the policy of using the Appointments Committee of the Association as part of their process of selecting nominees for the bench. Succeeding governors had been free to either continue this process or use another. The issue of whether to continue this policy is not within the purview of the judiciary.
The fourth criterion from Baker applies to cases which present "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of Government." Here, as previously noted, plaintiff is requesting the court to infringe upon the appointive power expressly delegated to the Governor under our state constitution.[2] We are aware of no authority whereby a court may restrict the Governor from seeking information concerning the qualifications of the judicial candidates by prohibiting the Association from communicating any information to the governor. In the exercise of the appointing power, the executive branch of the State government is immune from judicial supervision. Hughes, supra, 108 N.J. Super. at 174; accord, Clark v. Byrne, 165 N.J. Super. 98, 110 (Law Div.), aff'd 165 N.J. Super. 16 (App.Div. 1978).
In summary we find that the complaint presents a nonjusticiable political question which a court may not undertake to resolve.

II
The Appointments Committee of the Association is patterned after the Standing Committee on Federal Judiciary of the American Bar Association (ABA Committee), which provides the president of the United States with an opportunity to *445 rate nominees for federal judgeships. Seiler, supra at 754. The purpose of the Appointments Committee is to determine the qualifications of those whom the governor is considering for judicial appointment, reappointment or promotion. Ibid. The procedure, which is attached hereto as Appendix I, is set forth in the State Bar Committee Report, 95 N.J.L.J. 481, 490 (1972); see also Seiler, supra, at 754-755.
Recently, the United States District Court for the District of Columbia had occasion to analyze the evaluation procedure utilized by the President of the United States, the ABA Committee and the United States Department of Justice. Washington Legal Foundation and Public Citizen, Plaintiff Intervenor v. United States Department of Justice, 691 F. Supp. 483 (D.C. 1988). There plaintiffs requested declaratory relief and an injunction to compel the Department of Justice (Department) to comply with the Federal Advisory Committee Act (FACA), 5 U.S.C. App. § 11. The FACA requires the Department to, among other things, provide advance public notice of committee meetings, open meetings to the public, and maintaining and providing public access to the Committee's reports. Id. at 485. In addition, plaintiff Washington Legal Foundation requested the District Court to order the Department to assemble and provide it with information such as the names of potential nominees. Ibid., n. 4.
In denying the plaintiffs' motions for summary judgment and granting the Department's motion to dismiss or, alternatively, for summary judgment, the District Court noted that at issue was "the information provided to the President by the fourteen-member ABA Standing Committee on Federal Judiciary, one of the several working committees of the 328,000-member American Bar Association and a private entity not financially supported by any federal agency." Id. at 486. (Footnotes omitted.) Since the Association's Appointments Committee is patterned after that of the ABA Committee, it is not surprising that the procedure is strikingly similar to that utilized by the Association's committee.
*446 At the direction of the President's Federal Judicial Selection Committee, the Department commences the review process by requesting the ABA Committee to investigate and evaluate potential candidates' professional qualifications and to provide a formal report to the Assistant Attorney General. The Department does not provide the names of potential nominees to any other non-governmental entities for evaluation. Ibid. The Department notifies candidates of their selection for possible nomination, requests candidates to complete a Personal Data Questionnaire designed by the ABA, and directs them to provide the information requested on that questionnaire to the Chair of the ABA Committee, to the Committee's representative for the relevant federal circuit, and to the Assistant Attorney General, Office of Legal Policy. Id. at 486-487. The ABA Committee's review process
has traditionally involved confidential interviews with lawyers, judges, and professors in the nominee's community, close scrutiny of the nominee's legal writings, and talks between Committee members and the nominee over the nominee's qualifications. All details of the review process and the identity of those asked to discuss a nominee's qualifications are kept confidential by the ABA. [Ibid, citing Washington Legal Foundation, 648 F. Supp. 1353, 1355 (D.D.C. 1986).]
The District Court noted that in selecting individuals to nominate for federal judgeships, the President, as does the Governor of New Jersey, considers numerous sources of information and advice, including private citizens, public officials and government agencies. Id. at 486. (For example, in New Jersey the Governor enlists the services of the New Jersey State Police through the attorney general for a background check on potential nominees.) The Washington Legal Foundation court noted that the ABA Committee has historically been utilized and is an important source of advice concerning federal judicial nominees. Id. at 488-489. The District Court further noted that evaluations of candidates are an integral and important part of the nomination process. Ibid. The ABA Committee, like the Association's Appointments Committee, provides *447 its recommendations and reports confidentially through the Department and, only later, publicly to the Senate. Ibid.
The District Court stressed the need and necessity for confidentiality concerning the investigation and evaluation of the professional qualifications of potential nominees for judgeships:
The hallmark of the ABA Committee's relationship with [the Department] and its evaluation process is confidentiality. The ABA Committee has found in its experience that "only by assessing and maintaining such confidentiality can sources be persuaded to provide full and candid information." The ABA Committee also places a high value on confidentiality out of respect for the Presidential prerogative in the nomination process. As the Committee itself has observed: "Public disclosure of the Committee's evaluation prior to its report to the Senate Judiciary Committee after the nomination has been made is more serious. The nomination process is a Presidential function and the President should be able to obtain a confidential assessment of prospective nominees as an aid in making the nomination." [Id. at 494; footnotes omitted.]
* * * * * * * *
The importance of confidentiality of communications and deliberations in the exercise of executive functions is well-recognized by the courts. The Supreme Court noted in United States v. Nixon, 418 U.S. 683 [94 S.Ct. 3090, 41 L.Ed.2d 1039] (1973), that there is a valid need for protection of communications between high Government officials and those who advise and assist them in the performance of their manifold duties. Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearance and for their own interests to the detriment of the decisionmaking process. Id. at 705.... [94 S.Ct. at 3106] [T]he [Nixon] Court expressly recognized the "necessity for protection of the public interest in candid, objective, and even blunt or harsh opinions in Presidential decisionmaking." [Id. at 494 (quoting Nixon, 418 U.S. at 708 [94 S.Ct. at 3107]) (footnote omitted)].
Continuing on its focus concerning confidentiality of the reports, the court noted that,
investigation of an individual's "competence, integrity, and temperament" is inevitably a sensitive undertaking and it would normally evoke forthright, critical comments that would not otherwise be provided to decisionmakers were the comments to be made public. Furthermore, here, the public and Congress have a full opportunity to evaluate the actual nominee and to probe more deeply through the Senate confirmation hearings once the initial screening has been finished by the Executive. [Id. at 495; (footnote omitted).]
The court then concluded that any need to publicize the reports of the ABA Committee "is outweighed by the President's interests in preserving confidentiality and freedom of consultation *448 in selecting judicial nominees." Id. at 496. The rationale in Washington Legal Foundation is equally applicable to the confidentiality of the Association's Appointments Committee report to the Governor.
As noted in Seiler, supra at 753-754: "The reason for secrecy is [, of course,] to [spare] embarrassment to persons not chosen, since well-qualified candidates might not otherwise permit submission of their names."
Although plaintiff seeks to enjoin and restrain defendants from communicating to the Governor any opinion with regard to the nomination of any person to the judiciary, he qualifies the application for an injunction by stating "unless such communication shall first have been approved by each member of Defendant Association."[3] (Emphasis supplied.) Interestingly, although plaintiff requests the court to require a plebiscite, apparently of the entire membership of the Association, for recommendation of nominees to the judiciary, he obviously recognizes the need for confidentiality, as indicated by his reference in the complaint to "the proposed nomination of one P.D.C. (said initials having been substituted herein for the full name of the actual person) to the judiciary."
As the discussion of Washington Legal Foundation reveals, plaintiff's contention concerning nomination by unanimous approval of judicial nominees is totally without merit.

*449 III
Along with proposing an injudicious and ill-conceived plan for a plebiscite of the entire Association for recommendation of judicial nominees, the plaintiff also suggests that the court abrogate the bylaws which have been adopted by members of the Association. Deference has always been afforded to the internal decisionmaking process of private associations. These associations must have considerable latitude in rulemaking in order to accomplish their objectives and generally, their private law is binding on those who wish to remain members. Higgins v. American Soc. of Clinical Pathologists, 51 N.J. 191, 202 (1968). See also Calabrese v. Policemen's Benevolent Ass'n Local # 76, 157 N.J. Super. 139, 146-147 (Law Div. 1978).
Article VIII, Section 6(a) of the Associations' bylaws establishes as one of the standing committees, the Judicial and County Prosecutor Appointments Committee. Section 2 directs that appointment of members to serve on the committees shall be made by the president. Section 6(a) of Article VIII (Committees) provides that: "The Judicial and County Prosecutor Appointments Committee shall consist of not more than 24 members, with at least one member from each county in the state each member of which shall serve for a term of three years." Article IX (Representation of the Association), Section 2 requires that: "No report, recommendation or other action of any division, section or committee other than the Judicial and County Prosecutor Appointments Committee shall be considered as the action of the Association until it shall have been approved by the Board of Trustees." (Emphasis supplied.)
There can be no question but that a non-profit corporation is authorized to adopt or amend the bylaws for the administration and regulation of the affairs of the corporation. N.J.S.A. 15A:2-10 and 15A:3-1a(11); see Moorestown Mgmt. v. Moorestown Book Shop, et als, 104 N.J. Super. 250, 260 (Ch. Div. 1969). Further, the constitution and by-laws of a voluntary association become a part of the contract entered into by a *450 member who joins the association. Leeds v. Harrison, 7 N.J. Super. 558, 570 (Ch.Div. 1950); accord Delmarmo Associates v. N.J. Eng'g & Supply Co., 177 N.J. Super. 15, 17 (App.Div. 1980). "[I]t is well established that a voluntary association may, without direction or interference by the courts, draw up for its government and adopt rules, regulations and by-laws which will be controlling as to all questions of ... doctrine or internal policy." 6 Am Jur 2d, Associations and Clubs, § 5 at 433 (footnote omitted).
Generally, judicial intervention into the affairs of a non-profit association is justifiable "only when the complaining parties have suffered an invasion of their civil rights, of person or of property." Leeds v. Harrison, 9 N.J. at, 215; 6 Am Jur 2d, supra, § 27 at 453-454. Non-profit corporate associations such as the Association are given the utmost latitude in their regulation and management of intracorporate affairs. Leon v. Chrysler Motor Corporation, 358 F. Supp. 877, 885 (D.N.J.) aff'd o.b. 474 F.2d 1340 (3rd Cir.1973).
If plaintiff wants to change the entire system concerning the procedure of the Judicial and County Prosecutor Appointments Committee, the proper vehicle is through an amendment to the bylaws as provided under Article XI, Section 1. "Where intracorporate machinery exists for the resolution of internal disputes, the court [] may only inquire whether such procedures comport with due process and are fairly and honestly administered." Leon, 358 F.Supp at 822 (applying New York law). "Only the most abusive and obnoxious by-law provision could properly invite a court's intrusion into what is essentially a business thicket." Id. at 885.
Ordinarily, the contracting parties, not the courts, must weigh and evaluate the wisdom of their corporate agreements and regulations. Having voluntarily submitted to the rule of the corporate majority, all members are thereby bound and are barred from seeking judicial redress unless the corporate rule or action complained of contravenes the certificate of incorporation, [New Jersey] law or a strong public "policy" of [this] State. [358 F. Supp. at 885.]
*451 From our review of the proceedings in this matter, we are satisfied that the long-standing procedure by which the Governor solicits information from the Appointments Committee of the Association has been duly authorized under the bylaws of the Association and that the need for confidentiality is self-evident from our analysis above. In our view, the procedure adopted by the Association and the Governor is a proper and reasonable function of a bar association. The recommendations by the Appointments Committee are not binding upon the Governor, who is free to accept or, as has been done in the past, to reject any recommendation. We find that there is no contravention of public policy nor is there any basis for judicial intervention into the internal affairs of the Association.
AFFIRMED.

APPENDIX I
(1) After the Governor has obtained from the prospective nominee his answers to a detailed questionnaire, which was prepared by the Committee for the Governor's use, and an indication of the possible nominee's willingness to accept if appointed, without any commitment by the Governor that he will nominate, the completed questionnaire is forwarded to the Committee. It is reproduced at the State Bar Headquarters and forwarded to each member of the Committee. Copies of the forms of questionnaires for prospective judges and county prosecutors are annexed to this report as Exhibits C and D, respectively.
(2) Thereafter, the Committee conducts a thorough and comprehensive confidential investigation of the possible nominees' qualifications, such investigation centering largely among members of the bench and bar in the area where the possible nominee sits or practices.
(3) At the same time, the possible nominee's record for ethical conduct is screened through the Office of the Administrative Director of the Courts.
*452 (4) As part of the confidential investigation, the Judicial Appointment Committee of the County Bar Association of the county in which the prospective nominee practices or the judge being considered for reappointment or promotion sits is requested to make a confidential investigation of its own and to report back to the State Bar Committee before it reaches its final conclusion. Forms of evaluation questionnaire are completed by both the member of the State Bar Committee and the County Bar Committee. A copy of that form is annexed to this report as Exhibit E.
(5) All prospective nominees are requested to appear in person before the State Bar Committee after the confidential investigation has been completed and before the Committee reports its conclusions to the Governor.
(6) After the investigation and personal interview have been completed, the Committee reports its conclusions to the Governor.
(7) A judge being considered for reappointment or promotion normally is not invited to appear before the Committee unless the Committee has some doubt as to his qualifications after making its confidential investigation. One exception to this rule is that anyone being considered for appointment to the Supreme Court, whether he be a lawyer or a judge, is requested to appear before the Committee, that appointment being considered of sufficient importance to require such, regardless of the person's reputation at the bar or on the bench.
(8) Here again, for obvious reasons, the confidentiality of the entire process is stressed as essential to success  upon the part of the Governor and his staff, the Committee and its staff and all of those who are consulted during the course of the investigation. The only reservation in this agreed confidentiality is when and if the Governor nominates one whom the Committee concludes is not qualified. Then the Committee reserves the right to appear before the Senate Judiciary Committee to make *453 known its conclusions, without, however, revealing the sources of its information upon which its conclusions are based.
NOTES
[1] See Seiler, "Judicial Selection In New Jersey", 5 Seton Hall Review, 721, 752 (Summer 1974).
[2] N.J. Const., 1947, Art. VI, § 6, ¶ 1.
[3] In his "Statement of Facts" plaintiff argues that:

The committee, working behind a "veil of secrecy", prepares a detailed report about each nominee, which it forwards, in the name of the Association, to the Governor. None of the 25,000 members of the Association is ever permitted to know the contents of the report, except for the president and the chairman of the committee. In practice, the [Association] president and committee chairman utilize the report to express their own personal preferences without regard to the feelings of any other member of the Association. Their false statements to the Governor, composed from personal prejudice and fantasy, emanate without the slightest opportunity for membership input or challenge.