634 A.2d 493

FRED DE VESA, ACTING ATTORNEY GENERAL OF NEW JERSEY; HON. MARIANNE ESPINOSA MURPHY, J.S.C.; JOHN H. ADLER, A MEMBER OF THE SENATE OF THE STATE OF NEW JERSEY, AND WILBUR C. HANTEL, A CITIZEN OF NEW JERSEY, PLAINTIFFS–APPELLANTS, AND EDWARD T. O'CONNOR, JR., A MEMBER OF THE SENATE OF THE STATE OF NEW JERSEY, PLAINTIFF, v. JOHN H. DORSEY, INDIVIDUALLY AND AS A MEMBER OF THE SENATE OF THE STATE OF NEW JERSEY; DONALD DI FRANCESCO, INDIVIDUALLY AND AS PRESIDENT AND MEMBER OF THE SENATE OF THE STATE OF NEW JERSEY; WILLIAM L. GORMLEY, INDIVIDUALLY AND AS CHAIR OF THE JUDICIARY COMMITTEE AND MEMBER OF THE SENATE OF THE STATE OF NEW JERSEY; AND THE FOLLOWING MEMBERS OF THE SENATE JUDICIARY COMMITTEE SEVERALLY AND INDIVIDUALLY; JOHN O. BENNETT, JAMES S. CAFIERO, JOHN E. DIMON, JOHN A. GIRGENTI, LOUIS F. KOSCO, ROBERT MAR-

TIN, BRADFORD S. SMITH, AND RAYMOND J. ZANE (COL-
LECTIVELY THE "PRIMARY DEFENDANTS"), DEFEN-
DANTS–RESPONDENTS, AND THE FOLLOWING MEMBERS
OF THE SENATE OF THE STATE OF NEW JERSEY SEVER-
ALLY AND INDIVIDUALLY, C. LOUIS BASSANO, DR. GERALD
CARDINALE, ANDREW R. CIESLA, RANDY CORMAN, JOHN
H. EWING, C. WILLIAM HAINES, PETER A. INVERSO, JO-
SEPH M. KYRILLOS, JR., RICHARD J. LA ROSSA, ROBERT E.
LITTELL, JOHN J. MATHEUSSEN, HENRY F. MC NAMARA,
JOSEPH A. PALAIA, WILLIAM E. SCHLUTER, JOHN F.
SCOTT, AND JACK G. SINAGRA (COLLECTIVELY THE "OTH-
ER INTERESTED DEFENDANTS"), DEFENDANTS, AND
RICHARD J. CODEY, THOMAS F. COWAN, MATTHEW FELD-
MAN, BERNARD F. KENNY JR., RAYMOND J. LESNIAK, WY-
NONA M. LIPMAN, JOHN A. LYNCH, WALTER RAND, AND
RONALD L. RICE, DEFENDANTS–RESPONDENTS.

Argued September 8, 1993—Decided December 23, 1993.

*Jack M. Sabatino,* Assistant Attorney General, argued the cause for appellant Fred De Vesa, Acting Attorney General of New Jersey (*Fred De Vesa,* Acting Attorney General, attorney; *Mr. Sabatino, Joseph L. Yannotti* and *Mark J. Fleming,* Assistant Attorneys General, of counsel; *Mr. Sabatino* and *Donald M. Palombi,* Deputy Attorney General, on the briefs).

*James A. Plaisted* argued the cause for appellant Hon. Marianne Espinosa Murphy, J.S.C. (*Walder, Sondak, Berkeley & Brogan,* attorneys).

*Thomas S. Higgins* argued the cause for appellant John H. Adler (*Higgins, Slachetka & Long,* attorneys).

*Edward J. Dauber* argued the cause for appellant Wilbur C. Hantel, a citizen of New Jersey (*Greenberg, Dauber & Epstein,* attorneys).

*Edward N. FitzPatrick* argued the cause for respondents Donald Di Francesco, individually and as President and member of the Senate of the State of New Jersey; William L. Gormley, individually and as Chair of the Judiciary Committee and member of the Senate of the State of New Jersey; and the following members of the Senate Judiciary Committee severally and individually, John O. Bennett, James S. Cafiero, John E. Dimon, John A. Girgenti, Louis F. Kosco, Robert Martin, Bradford S. Smith and Raymond J. Zane (*Clapp & Eisenberg,* attorneys; *Mr. FitzPatrick, Agnes I. Rymer, Adam N. Saravay,* and *Robert J. Beacham,* on the briefs).

*John H. Dorsey* argued the cause *pro se.*

*Gerald Krovatin* argued the cause for *amicus curiae* Coalition for an Independent Judiciary (*Lowenstein, Sandler, Kohl, Fisher & Boylan,* attorneys).

*Thomas R. Curtin,* President, argued the cause for *amicus curiae* New Jersey State Bar Association.

*Leon J. Sokol,* Senate Minority Counsel, submitted a letter in lieu of brief on behalf of respondents John A. Girgenti, Raymond J. Zane, Richard J. Codey, Thomas F. Cowan, Matthew Feldman,

Bernard F. Kenny, Jr., Raymond J. Lesniak, Wynona Lipman, John A. Lynch, Walter Rand and Ronald L. Rice.

*Joseph T. Wilkins* submitted a brief on behalf of *amici curiae* Alan E. Kligerman and The Institute for Law and Justice, Inc.

*Bruce Eden* submitted a letter in lieu of brief on behalf of *amicus curiae pro se.*

*Robin Vinik* submitted a letter in lieu of brief on behalf of *amicus curiae pro se.*

PER CURIAM.

The judgment of the Superior Court, Chancery Division, Mercer County, is affirmed. The members of the Court being equally divided on the grounds for affirmance, the Court has filed no majority opinion.

POLLOCK, J., concurring.

This is an appeal from the dismissal of a complaint challenging the constitutionality of the exercise of "senatorial courtesy" on judicial nominations. Because of the exercise of senatorial courtesy, the New Jersey Senate refused to consider the nomination of a Superior Court judge for reappointment. The Chancery Division dismissed the complaint as raising a nonjusticiable political question. We granted the motion for direct certification of plaintiff Fred De Vesa, Acting Attorney General, 134 *N.J.* 467, 634 *A.*2d 517 (1993), and now affirm the judgment of the Chancery Division.

I

The New Jersey Constitution provides that "[t]he Governor shall nominate and appoint, with the advice and consent of the Senate ... the Judges of the Superior Court." *N.J. Const.* art. VI, § 6, ¶ 1. "Senatorial courtesy" is a practice followed by the Senate in exercising its constitutional power to confirm gubernatorial nominations. Over the years, senatorial courtesy has evolved as an unwritten, informal, and unofficial procedure allowing a single senator who resides in or represents any portion of the county in which a nominee is domiciled to veto the appointment without further action by the Senate. In this case, Senator John Dorsey invoked senatorial courtesy to oppose the reappointment

of Judge Marianne Espinosa Murphy to the Superior Court. Plaintiffs challenge the constitutionality of senatorial courtesy and its exercise on Judge Murphy's nomination.

In July 1986, Governor Thomas H. Kean nominated Judge Murphy of Chatham Borough, Morris County, to be a judge of the Superior Court. In September 1986, with the advice and consent of the New Jersey Senate, Governor Kean appointed her to that court. Under the New Jersey Constitution, the initial term for a Superior Court judge is seven years, after which time that judge may be reappointed by the Governor if confirmed by the Senate. *N.J. Const.* art. VI, § 6, ¶ 3. A reappointed judge receives tenure until the mandatory retirement age of seventy. *Ibid.*

Judge Murphy's initial seven-year term expired on September 11, 1993. In anticipation of the expiration of her term, Governor Jim Florio, on May 13, 1993, gave public notice to the Secretary of the Senate of his intent to submit Judge Murphy's name for reappointment and, on May 21, 1993, the Governor formally renominated Judge Murphy in a letter to the Senate President.

Senator Dorsey represents the twenty-fifth legislative district, which includes a part of Morris County, but not Chatham Borough. Invoking senatorial courtesy, he refused to approve Judge Murphy's reappointment. Some senators disapproved of his exercise of senatorial courtesy. One senator, Raymond Lesniak, proposed a resolution, identified as Resolution 99,[1] which sought to

---

[1] Senate Resolution 99 provides:

A SENATE RESOLUTION to direct the Senate Judiciary Committee to hold a hearing on the reappointment of Judge Marianne Espinosa Murphy.

WHEREAS, The current term of Judge Marianne Espinosa Murphy as a member of the Superior Court is scheduled to expire on September 11, 1993; and

WHEREAS, On May 24, 1993, the Governor's Office submitted a nomination reappointing Judge Murphy as a Superior Court judge; and

WHEREAS, If that reappointment is approved by the Senate, Judge Murphy will have tenure as a Superior Court judge; and

WHEREAS, The democratic process dictates that Judge Murphy has the right to a full and honest debate on her record and performance as a Superior Court judge; and

WHEREAS, Whether Judge Murphy's record as a Superior Court Judge merits reappointment is an issue which should be determined in a public forum with

compel the Judiciary Committee to consider Judge Murphy's nomination and to make a recommendation to the Senate by September 1. As disclosed by the Senate minutes for August 16, 1993, the following events occurred:

> Senator Lesniak, pursuant to Rule 128 [which permits a senator to make a motion to move a resolution], moved to introduce [Senate Resolution No. 99] and have the same made the Order of the Day. Senator DiFrancesco ruled the motion was out of order.

> Senator Lesniak moved to appeal the ruling of the Chair. A machine vote was taken. The resolution Lost by the following machine vote: 12–22.

[Minutes of New Jersey Senate, August 16, 1993, at 1.]

Thus, the Senate defeated Senator Lesniak's motion to appeal the ruling of the Senate President. Thereafter, the Senate did not further consider the nomination.

On August 27, 1993, before the expiration of Judge Murphy's term, plaintiffs instituted this action. Plaintiffs are Acting Attorney General De Vesa, Judge Murphy, Senator John H. Adler, Senator Edward T. O'Connor, Jr., who is also a member of the Senate Judiciary Committee, and a citizen, Wilbur C. Hantel. Defendants are various senators, including Senator Dorsey, Senate President Donald T. DiFrancesco, and Senator William L. Gormley, the chair of the Senate Judiciary Committee.

---

both opponents and proponents of Judge Murphy's reappointment being given an opportunity to appear and testify; and

WHEREAS, The Senate Judiciary Committee has to date not scheduled consideration of Judge Murphy's reappointment; now, therefore,

BE IT RESOLVED by the Senate of the State of New Jersey:

1. The Senate Judiciary Committee is directed to schedule a committee meeting for the purpose of consideration of the reappointment of Judge Marianne Espinosa Murphy on or before August 23.

2. The Senate Judiciary Committee is further directed to forward its recommendations concerning Judge Murphy's reappointment to the full Senate on or before September 1.

STATEMENT

This resolution directs the Senate Judiciary Committee to hold a committee meeting on the reappointment of Judge Marianne Espinosa Murphy.

Plaintiffs sought injunctive relief and a declaratory judgment that the practice of senatorial courtesy, particularly as it applies to judicial nominations for reappointment, violates the New Jersey Constitution on various grounds. In the alternative, plaintiffs asked that Judge Murphy be deemed reappointed if, as a result of the actions or inactions of the defendants-senators, the entire Senate failed to act on her appointment before September 11, 1993.

On August 31, 1993, Senator Dorsey filed papers in opposition to plaintiffs' claims for relief and moved to dismiss on various grounds, including nonjusticiability. Other defendants took a similar position.

On September 2, 1993, Judge Carchman of the Chancery Division heard oral argument and, on September 3, dismissed plaintiffs' complaint. He determined that the case was not justiciable, noting that the Advice and Consent Clause commits the confirmation power to the Senate and that no standards exist by which the judiciary can determine whether the exercise of senatorial courtesy constitutes an abuse of that power. The court also concluded that senatorial courtesy was a valid exercise of the confirmation power under the Advice and Consent Clause of the State Constitution.

We heard oral argument on September 8, 1993. Three days later, Judge Murphy's term expired.

## II

This case implicates three principles that define the role of the judiciary in a democracy: judicial review, judicial restraint, and judicial independence. An independent judiciary, one free from political pressure, is essential to a democratic society. Notwithstanding the independence of judges from political considerations, judicial appointments, like other gubernatorial appointments, remain subject to the political process. Our focus is on the role of senatorial courtesy in that process.

Senatorial courtesy
as it relates to judicial appointments, may be stated as follows: If a nomination to judicial office with respect to a particular county is displeasing to one or more of the senators from that county, then the other members of the Senate will take no

action looking to the confirmation of the proposed nominee and this quite apart from the nominee's qualifications or lack thereof.

> [*Passaic County Bar Ass'n v. Hughes*, 108 *N.J.Super.*
> 161, 169, 260 *A.*2d 261 (Ch.Div.1969).]

Although not codified as a Senate rule of procedure relating to gubernatorial nominations, senatorial courtesy is nevertheless practiced in conjunction with those rules. Under the formal Senate Rules, all nominations received from the Governor are referred to the Senate Judiciary Committee, unless the Senate President directs the nomination differently. *Rules of the Senate, R.* 150. The Judiciary Committee considers the nomination and then reports to the Senate with a recommendation for either rejection or acceptance. *Rules of the Senate, R.* 151. The full Senate then votes on the nomination. *Rules of the Senate, R.* 152. According to an affidavit filed by Senator Gerald Cardinale, a senator can invoke senatorial courtesy after the Judiciary Committee receives the nomination. As described by Senator Cardinale, the practice is for the Judiciary Committee to send a form letter to each Senator "from the county and district where the nominee resides" seeking the approval of those Senators to the nomination. If any of those senators fails to "return the approval form," the Senate will take no further action on the nomination. The exercise of senatorial courtesy by a single senator refusing or failing to sign an "approval form" with respect to a nomination can be final. It " 'forecloses indefinitely any consideration by the committee on the merits of the nomination.' " *Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 172, 260 *A.*2d 261 (quoting Governor Richard J. Hughes, Address Before the Essex County Bar Association (April 1965)). In sum, the practice of senatorial courtesy allows a single senator to reject a nomination without regard to its merits, without disclosure of any reasons, without the conduct of any hearing, and without any action by the Senate as a whole. *Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 172, 260 *A.*2d 261.

As explained by Senator Dorsey at oral argument, the exercise of senatorial courtesy was restricted originally to the "home county" senator of a nominee. With the development of cross-county districts, however, the courtesy privilege was afforded to

any senator whose district extended into the county in which the nominee is domiciled. In effect, Senator Dorsey could exercise senatorial courtesy on Judge Murphy's nomination, although she is not one of his constituents.

## III

As a threshold matter, we consider whether this case has been rendered moot because the Senate did not confirm Judge Murphy's nomination during the term of her original appointment.

Unlike the federal Constitution, the New Jersey Constitution does not confine the exercise of the judicial power to actual cases and controversies. *See U.S. Const.* art. III, § 2, cl. 1; *N.J. Const.* art. VI, § 1, ¶ 1. Nevertheless, this Court refrains from rendering advisory opinions or exercising its jurisdiction in the abstract. *See In re J.I.S. Indus. Serv. Co. Landfill,* 110 *N.J.* 101, 104, 539 *A.2d* 1197 (1988).

Consistent with that principle, our courts normally will not entertain cases when a controversy no longer exists and the disputed issues have become moot. *See Oxfeld v. New Jersey State Bd. of Educ.,* 68 *N.J.* 301, 303–04, 344 *A.2d* 769 (1975). A case is technically moot when the original issue presented has been resolved, at least concerning the parties who initiated the litigation. *Id.* at 303, 344 *A.2d* 769.

In some circumstances, however, our courts will entertain a case despite its mootness. Specifically, our courts will entertain a case that has become moot when the issue is of significant public importance and is likely to recur. *In re Conroy,* 98 *N.J.* 321, 342, 486 *A.2d* 1209 (1985); *Clark v. Degnan,* 83 *N.J.* 393, 397, 416 *A.2d* 816 (1980). "While we ordinarily refuse to examine moot matters due to our reluctance to render legal decisions in the abstract and our desire to conserve judicial resources, we will rule on such matters where they are of substantial importance and are capable of repetition yet evade review." *In re J.I.S. Indus. Serv. Co. Landfill, supra,* 110 *N.J.* at 104, 539 *A.2d* 1197 (citations omitted).

The threatened veto of Judge Murphy's reappointment by the exercise of senatorial courtesy triggered this litigation. Her term of office expired without reappointment before the matter could be

adjudicated; hence, the constitutionality of the veto of her judicial nomination by the exercise of senatorial courtesy no longer poses a live issue. Nevertheless, the validity of senatorial courtesy remains an issue of extraordinary public concern. It raises fundamental questions implicating the respective powers and responsibilities of each branch of government over the appointment of judges.

Further, the constitutionality of senatorial courtesy as an exercise of the Senate's confirmation powers with respect to judicial appointments may recur. As illustrated by the circumstances of this case, the relatively short period of time between a judge's renomination and the expiration of that judge's initial term constrains the ability of a court to adjudicate the validity of senatorial courtesy. Consequently, the issue is one that may often escape review. We therefore invoke the well-established exception to the mootness doctrine and entertain this action.

## IV

We next consider whether the issue before the Court is justiciable. Stated generally, that issue is whether the courts can adjudicate a challenge to the constitutionality of senatorial courtesy. As Justice Brennan wrote in *Baker v. Carr*, 369 *U.S.* 186, 211, 82 *S.Ct.* 691, 706, 7 *L.Ed.*2d 663, 682 (1962), "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government ... is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." So here, if we treat the issue as subject to judicial review, we may proceed to the substance of the claim. But if we determine that the matter is best left to the Senate, we should dismiss the case immediately so as not to " 'spawn[ ] any legal consequences' " by any further discussion of a nonjusticiable issue. *Goldwater v. Carter*, 444 *U.S.* 996, 1005, 100 *S.Ct.* 533, 538, 62 *L.Ed.*2d 428, 438 (1979) (Rehnquist, J., concurring) (quoting *United States v. Munsingwear*, 340 *U.S.* 36, 41, 71 *S.Ct.* 104, 107, 95 *L.Ed.* 36, 42 (1950)). Like the Chancery Division, we conclude that this case presents a nonjusticiable political question.

*Baker, supra,* states the basic test for the analysis of justiciability:

Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

[369 *U.S.* at 217, 82 *S.Ct.* at 710, 7 *L.Ed.*2d at 686.]

We begin our analysis by determining whether a specific constitutional provision has been textually committed to one of the political branches. As Chief Justice Warren stated in *Powell v. McCormack,* 395 *U.S.* 486, 521 n. 43, 89 *S.Ct.* 1944, 1964 n. 43, 23 *L.Ed.*2d 491, 516 n. 43 (1969), "the force of respondents' ... arguments that this case presents a political question depends in great measure on the resolution of the textual commitment question." This case presents a clear textual commitment to a coordinate political branch, the New Jersey Senate.

The Constitution explicitly places the power of advising and consenting in the hands of the New Jersey Senate, not the executive or judicial branches. "Here is a clear commitment [to the Senate] derived from the text of the Constitution itself." *Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 173, 260 *A.*2d 261. "The Governor (Executive) is authorized to nominate and appoint. The Senate (Legislative) is to advise and, before the appointment may be finally made, to consent." *Ibid.* Missing from the Constitution is any role for the judiciary. Because "[t]he nonjusticiability of a political question is primarily a function of the separation of powers," *Baker, supra,* 369 *U.S.* at 210, 82 *S.Ct.* at 706, 7 *L.Ed.*2d at 682, we would unduly dislocate that separation if we were to prescribe how the Senate is to conduct the confirmation process.

In an analogous case, this Court refused to interfere with the legislative custom of "gubernatorial courtesy," a practice under which a bill that has passed both houses of the Legislature is not presented to the Governor for signing until the Governor "calls" for the bill. *Gilbert v. Gladden*, 87 *N.J.* 275, 432 *A.*2d 1351 (1981). That practice, in effect, vests the Governor with a "pocket veto." The plaintiffs in *Gilbert* included members of the Senate and Assembly who sued the leaders of both houses to compel prompt presentation of passed bills to the Governor, even if the Governor had not called for the bill.

Although the *Gilbert* Court found the use of gubernatorial courtesy to be "questionable," 87 *N.J.* at 287, 432 *A.*2d 1351, it determined the issue to be a "nonjusticiable political question the resolution of which is constitutionally committed to the Legislature...." *Id.* at 288, 432 *A.*2d 1351. Finding a textual commitment to the legislative branch, the Court concluded that "[w]hether gubernatorial courtesy is to be further sanctioned or finally condemned must be determined either by the Legislature or at the bar of public opinion" and not in a courtroom. *Id.* at 287–88, 432 *A.*2d 1351.

Similarly, in *Nixon v. United States*, 506 *U.S.* ——, 113 *S.Ct.* 732, 122 *L.Ed.*2d 1 (1993), the United States Supreme Court declined to decide whether the Senate could fulfill its constitutional obligation to try impeachment cases by delegating that duty to a twelve-member committee. The *Nixon* Court examined the scope of article 1, section 3, clause 6 of the United States Constitution, which provides that "[t]he Senate shall have the sole power to try all Impeachments." Through Impeachment Rule XI, the Senate delegated to a committee " 'all the powers and functions conferred upon the Senate ... when sitting on impeachment trials.'" See *id.* at —— n. 1, 113 *S.Ct.* at 734 n. 1, 122 *L.Ed.*2d at 8 n. 1 (quoting Senate Impeachment Rule XI). Nixon, a convicted federal judge, contended that the term "try" required the entire Senate, not merely a committee, to conduct an impeachment trial. The Court, however, determined that it could not interpret "try"

because the Constitution textually committed to the Senate the responsibility for trying articles of impeachment. *Id.* at ——, 113 *S.Ct.* at 736, 122 *L.Ed.*2d at 10.

The *Nixon* Court buttressed its reliance on the text of the Constitution by pointing to the lack of judicially-discoverable standards, stating that "the concept of a textual commitment to a coordinate political department is not completely separate from the concept of a lack of judicially discoverable and manageable standards for resolving it; the lack of judicially manageable standards may strengthen the conclusion that there is a textually demonstrable commitment to a coordinate branch." *Id.* at ——, 113 *S.Ct.* at 735, 122 *L.Ed.*2d at 9. Similarly, the absence of standards in this case confirms the inappropriateness of judicial involvement.

Contrary to our concurring and dissenting colleagues, *post* at 448–450, 458–459, 634 *A.*2d at 507–508, 512–513, we find no manageable standards in the Advice and Consent Clause of the New Jersey Constitution. Nothing defines "advice and consent." Nor does the Constitution specify how the Senate is to exercise its responsibility. As then Judge, later Justice, Mountain, asked rhetorically: "How is a judicial inquiry to be undertaken to find out whether, in fact, inaction on the part of the Senate results from a deference to the tradition and practice of senatorial courtesy or from some other cause?" *Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 173, 260 *A.*2d 261; *cf. Loigman v. Trombadore,* 228 *N.J.Super.* 437, 443, 550 *A.*2d 154 (App.Div.1980) (finding no judicially-manageable standards in article VI, section 6, paragraph 1 pertaining to gubernatorial power to nominate judges). The Senate has the power to withhold action on a nomination for any number of reasons: the President might refuse to post a nomination for a Senate vote, the Senate could vote in caucus not to move a nomination for consideration, or the chair of the Judiciary Committee could fail to schedule a hearing for any reason, including deference to any one senator.

We are similarly unpersuaded by our colleagues' attempt to derive from the term "Senate" a standard that would require collective action by the entire Senate when providing advice and consent. As with the term "advice and consent," the standard derived from "Senate" is unmanageable. Our colleagues construe "Senate" to mean that "at some point in the life of a nomination the entire Senate as a legislative body must manifest collectivity when it takes final action on the nomination." *Post* at 454, 634 A.2d at 510. We cannot discern from their opinion what action will satisfy that standard. Furthermore, by requiring a collective vote on the nomination they ignore the Senate's prerogative either to act or not to act. The Constitution does not mandate that the Senate "shall" advise on and consent to an appointment; it merely contemplates that the nomination will not proceed without the advice and consent of the Senate. Consistent with the plain language of the Constitution, the Senate Rules recognize that the Senate President may prevent the referral of a nomination to the Judiciary Committee. *See Rules of the Senate, R.* 150 (providing that "[w]hen nominations shall be made by the Governor to the Senate, they shall, unless otherwise ordered by the Senate President, be referred to the Judiciary Committee"). The Rules likewise recognize that without Senate action, a nomination will lapse. *Rules of the Senate, R.* 154b (stating that "[a]ll nominations neither confirmed nor rejected during an annual session of the Senate shall not be acted upon in a subsequent annual session without being again made to the Senate by the Governor"). In brief, the text of the Constitution restrains us from ordering the Senate to confirm a nomination, just as it restrains us from ordering the Governor to submit one. The Senate, like the Governor, is part of a co-equal branch with which we may disagree, but which, notwithstanding our disagreement, we must respect.

Presumably, our colleagues are prepared not only to determine when the Senate has acted, but also to invalidate any Senate Rules that are inconsistent with that determination. Our colleagues must also be prepared to provide a remedy, one that remains

undefined in their opinion, if the Senate ignores that determination. Perhaps this Court could devise a confirmation process that is fairer than that devised by the Senate. Devising such a process, however, is a prerogative of the people and their elected representatives, not the judiciary.

The *Nixon* Court, when faced with a similar argument that the term "Senate" means the full Senate and not a Senate Committee, refused to require such collective action. In rejecting Judge Nixon's interpretation of "Senate" in the Impeachment Clause, Chief Justice Rehnquist declared in *dicta:*

> It would be possible to read the ... [Impeachment] Clause this way, but it is not a natural reading. Petitioner's interpretation would bring into judicial purview not merely the sort of claim made by petitioner, but other similar claims based on the conclusion that the word "Senate" has imposed by implication limitations on procedures which the Senate might adopt.

[506 *U.S.* at ——, 113 *S.Ct.* at 737, 122 *L.Ed.*2d at 11.]

The Supreme Court foresaw a potential flood of litigation were it to acknowledge a "collectivity" requirement in the federal Congress. Additionally, it found Judge Nixon's reading to be inconsistent with its construction of the Impeachment Clause.

We are unpersuaded by our colleagues' distinction of the *Nixon* Court's analysis of the term "Senate." *Post* at 450–452, 634 *A.2d* at 508–509. They recite that the Impeachment Clause contains other express limitations that the Advice and Consent Clause does not, namely, that the Senate take an oath when sitting for the purpose of impeachment; that the Chief Justice preside when the President is tried; and that conviction requires a two-thirds majority. From that, they distinguish the term "Senate" in the federal Impeachment Clause and conclude that nothing prevents a "commonsense and natural" reading of the term "Senate" in the State provision to derive the collectivity standard. *Id.* at 451, 634 *A.2d* at 509.

Their analysis misses the mark. Even in the absence of specific limitations in the Impeachment Clause, the *Nixon* Court would have held the case to present a nonjusticiable political question.

As previously indicated, the Court's holding was based on the textual commitment to the Senate and the lack of judicially-manageable standards. *See Nixon, supra,* 506 *U.S.* at ——, 113 *S.Ct.* at 741–42, 122 *L.Ed.*2d at 16 (White, J., concurring) ("The majority finds a clear textual commitment in the [Impeachment Clause]. . . ."); *id.* at ——, 113 *S.Ct.* at 743–44, 122 *L.Ed.*2d at 19 (White, J., concurring) ("The majority also contends that the term 'try' does not present a judicially manageable standard."). As the *Nixon* majority emphasizes, the Court's conclusion is merely "fortified" by the three express limitations in the clause. *Id.* at ——, 113 *S.Ct.* at 736, 122 *L.Ed.*2d at 6. The inconsistency of collective action with the Court's construction of the word "Senate" in the Impeachment Clause was not essential to the holding of the case. In fact, one of the limitations in the Impeachment Clause, the requirement that "no Person shall be convicted without the Concurrence of two thirds of the Members present," counsels in favor of collective action. *U.S. Const.* art. I, § 3, cl. 6. Yet, the *Nixon* Court refused to demand that the full Senate conduct an impeachment trial.

Our colleagues read *Nixon* to mean that the United States Supreme Court upheld Judge Nixon's conviction because the Senate acted collectively when it eventually voted on the articles of impeachment. The Court, however, did not uphold the conviction for that reason. It merely held nonjusticiable Nixon's challenge to the method selected by the Senate for conducting the trial. The Senate's vote as a body, although essential to the impeachment, was nonessential to the Court's holding. Thus, the fact that the United States Senate voted collectively on Nixon's impeachment lends no support to our colleagues' argument that the New Jersey Senate must vote collectively when rendering its advice on and consent to gubernatorial nominations. The flaw in their argument is the assumption that the Court found that the collective vote satisfied the Senate's obligation to try Nixon—the precise issue that the Court declined to reach. Indeed, to the extent that delegating to a single senator the power of "senatorial courtesy" over a gubernatorial nomination is like delegating the trial of an

impeachment to a committee, the refusal of the United States Supreme Court to review the trial in *Nixon* supports our like refusal to review the exercise of senatorial courtesy here.

We would be remiss if we failed to note that our colleagues' conclusion that the term "Senate" requires collective action is exclusively the product of their own ingenuity. No party has so argued in this case. Perhaps for that reason, the Chancery Division did not consider the issue. The point has also escaped the attention of every other court that has addressed senatorial courtesy. Nor is it mentioned in the proceedings of the 1947 constitutional convention. That omission is all the more striking because senatorial courtesy has existed in this State since the last century. *See Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 168–72, 260 *A.*2d 261 (summarizing the history of senatorial courtesy). Indeed, the history of the 1947 Constitution reflects an unsuccessful attempt to abolish it. The proposed 1944 Constitution provided that if the Senate did not affirm or return a nomination within six months, the nomination would be deemed to be confirmed, an apparent attempt to eliminate senatorial courtesy. *Public Hearings on the Revised Constitution* 1944, Subcommittee on the Executive Article, February 2, 1944, at 145–20. That Constitution, however, was not ratified. Although the Committee on the Executive, Militia, and Civil Officers for the 1947 Constitution heard testimony suggesting a requirement for Senate action on nominations within a prescribed time, 5 *State of New Jersey Constitutional Convention of 1947* at 51 (testimony of Governor Harold G. Hoffman); *id.* at 90 (testimony of Charles R. Erdman, Jr., of Committee on Constitutional Revision); *id.* at 101–02 (same); *id.* at 134 (testimony of Mrs. Charles Kellers of League of Women Voters); *id.* at 476 (recommendations of League of Women Voters), the Constitution contains no such requirement. One might expect that so dramatic a change in the interpretation of the Advice and Consent Clause as that proposed by our colleagues, if tenable, would have been proposed previously by someone at the 1947 Constitutional Convention, a scholar, a

lawyer, or a court. The absence of any such proposal casts doubts on our colleagues' conclusion.

The New Jersey Senate has determined that senatorial courtesy should play a role in the confirmation of gubernatorial nominations. If we were senators, we might well reach a different conclusion. For present purposes, however, we are restrained by the belief that the judiciary should not review the Senate's decision. Government, including the part allocated to the judiciary, is an art as well as a science, requiring an appreciation not only of the allocation of power to other branches, but also of the subtleties of the exercise of that power. We find the challenge to the Senate's exercise of its confirmation power to be nonjusticiable.

Having decided that the case was nonjusticiable, the Chancery Division did not reach defendants' additional claims that senatorial courtesy is protected both as an internal legislative rule of procedure and as an expression of the legislative prerogatives of speech and debate. Because we also find the matter to be nonjusticiable, we likewise do not reach these additional claims.

## V

We also disagree with our colleagues' factual predicate that the August 16 vote on the procedural motion constituted the discharge of the Senate's constitutional duty to advise on and consent to judicial nominations. *Post* at 459–464, 634 *A.*2d at 512–513. From the bare fact that a negative vote on the motion would foreclose further consideration, our colleagues conclude that every senator understood and intended that a vote on the motion constituted a vote on the nomination. Although some senators may have so perceived their vote, we are precluded from "delving into the thought processes and motivations which led each individual senator to vote or not vote as he did." *Kligerman v. Lynch,* 92 *N.J.Super.* 373, 376, 223 *A.*2d 511 (Ch.Div.1966). The plain language of the motion reveals that it was nothing more than an appeal from a ruling of the President of the Senate denying consideration of Senate Resolution 99. According to the Senate's

minutes, Senate Resolution 99 sought only a direction from the Senate Judiciary Committee to consider Judge Murphy's nomination and to forward its recommendations to the full Senate. If the motion had carried, it would have directed the Senate President to submit Senate Resolution 99 to the Senate for consideration. If, in turn, that resolution had passed, the Senate Judiciary Committee could have either approved or disapproved the nomination, and the Senate thereafter could have either granted or withheld its advice and consent. Thus, before the Senate could vote on Judge Murphy's nomination, it was required to vote in favor of the motion requiring consideration of Senate Resolution 99 and, if the motion had carried, to vote on the resolution. Passage of the resolution would have required the Senate Judiciary Committee to consider Judge Murphy's nomination and to forward its recommendations to the Senate, at which point the Senate would then consider the Judiciary Committee's recommendations. Only after all four of these steps had been completed would the Senate have voted on the nomination. Any senator who voted in favor of the motion or the resolution could have voted against the nomination, and any Senator who voted against the motion and resolution could have voted to confirm. For our part, the steps between the vote on the motion and the vote on the nomination are too numerous and uncertain to equate the one with the other.

The failure of the procedural motion admittedly led to the rejection of the nomination, but that was only because after the motion had failed, the Senate continued to honor the exercise of senatorial courtesy. We will never know, nor need we, what motivated the proponents and opponents of the motion to vote as they did. Nor will we ever know how any of the senators would have voted on Judge Murphy's nomination. The Senate never acted on the nomination.

No party has argued either in the Chancery Division or in this Court that the vote on the motion constituted the advice and consent of the Senate. The most that can be said is that in response to a question at oral argument, Senator Dorsey stated

that the Senate knew that the failure of the motion to carry would lead to the defeat of the nomination. Certainly, Judge Murphy did not perceive that the vote on the motion constituted the vote on her nomination. If she had so perceived that vote, she would not have instituted this suit. Likewise, the defendants-senators did not believe that their vote on the motion equated with advice on and consent to Judge Murphy's nomination, for they did not so argue in the Chancery Division or in this Court. Consequently, we respectfully disagree with our colleagues' characterization of the vote on the motion to appeal from a procedural ruling of the President of the Senate as constituting the Senate's advice and consent on Judge Murphy's nomination.

We also disagree with the wisdom of discussing generally judicial review of the confirmation process. Having determined that the vote on the resolution constituted the requisite collective action by the Senate, our colleagues proceed to discuss the practice of senatorial courtesy, which, according to them, does not constitute collective action. See *post* at 459–463, 634 *A.*2d at 512–514. The discussion is pregnant with the premise that to some undefined extent Senate confirmation is subject to judicial review. Implicit in judicial review, however, is an unavoidable intrusion into a co-equal branch of government, an intrusion that may draw courts into a political quagmire. See *Baker, supra,* 369 *U.S.* at 217, 82 *S.Ct.* at 710, 7 *L.Ed.*2d at 686 (stating that additional consideration in political question inquiry is "the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government . . ." ). We respectfully suggest that our colleagues, having determined that the Senate acted on the nomination, should not address the constitutionality of a hypothetical inaction attributable to the observance of senatorial courtesy.

## VI

Like our colleagues, however, we would not preclude all judicial review of senatorial courtesy. "We hold only that no such

questions are presented in this case." *Gilligan v. Morgan,* 413 *U.S.* 1, 12, 93 *S.Ct.* 2440, 2447, 37 *L.Ed.*2d 407, 416 (1973). If, for example, the Senate through the exercise of senatorial courtesy violated the fundamental rights of a nominee, we believe that the judiciary could review that action. *In re Lamb,* 67 *N.J.Super.* 39, 59, 169 *A.*2d 822 (App.Div.), *aff'd,* 34 *N.J.* 448, 170 *A.*2d 34 (1961).

As Justice Souter wrote in *Nixon,* "[n]ot all interference is inappropriate or disrespectful, . . . and application of the [political question] doctrine ultimately turns, as Learned Hand put it, on 'how importunately the occasion demands an answer.'" 506 *U.S.* at ——, 113 *S.Ct.* at 748, 122 *L.Ed.*2d at 24 (Souter, J., concurring in judgment) (quoting Learned Hand, *The Bill of Rights* 15 (1958)). According to Justice Souter, if the Senate convicted a federal officer on the results of a coin toss, judicial interference would be warranted. *Ibid.* To carry forward his metaphor, judicial review would likewise be warranted in the unlikely event that the Senate were to try to give its advice on and consent to a nomination through a coin toss. *See Groppi v. Leslie,* 404 *U.S.* 496, 92 *S.Ct.* 582, 30 *L.Ed.*2d 632 (1972) (upholding due-process review over state legislative contempt proceedings); *Bond v. Floyd,* 385 *U.S.* 116, 87 *S.Ct.* 339, 17 *L.Ed.*2d 235 (1966) (deeming case justiciable when failure to seat legislator resulted in First Amendment violation); *Gomillion v. Lightfoot,* 364 *U.S.* 339, 347, 81 *S.Ct.* 125, 130, 5 *L.Ed.*2d 110, 116 (1960) (finding that allegation of discrimination in violation of Fifteenth Amendment lifted reapportionment dispute "out of the so-called 'political' arena and into the conventional sphere of constitutional litigation"); *Barry v. United States ex rel. Cunningham,* 279 *U.S.* 597, 614, 49 *S.Ct.* 452, 455, 73 *L.Ed.* 867, 872 (1929) (holding United States Senate's power to issue arrest warrant to be "subject only to the restraints imposed by or found in the implications of the Constitution"); *Kilbourn v. Thompson,* 103 *U.S.* (13 Otto) 168, 199, 26 *L.Ed.* 377, 390 (1881) (declaring that "[t]he House of Representatives . . . is not the final judge of its own power and privileges in cases in which the rights and liberties of the subject are concerned, but the legality of its action may be examined and determined by this

court"); *State v. Rogers*, 56 *N.J.L.* 480, 616, 28 *A.* 726 (Sup.Ct. 1894) (holding that "when the inquiry is whether the legislature or any other body or officer has violated the regulations of the constitution, it is entirely plain that the decision of that subject must rest exclusively with the judicial department of the government").

Our colleagues allege that judicial restraint in the face of an exercise of senatorial courtesy violates "bedrock principles of representative democracy." *Post* at 463, 634 *A.*2d at 515. A comparison of the opinions in *Baker* and in *Nixon* refutes the allegation. In *Baker*, the United States Supreme Court confronted a violation of the Equal Protection Clause by a statutory-apportionment scheme of legislative districts. 369 *U.S.* at 187–88, 82 *S.Ct.* at 694, 9 *L.Ed.*2d at 668. To vindicate the violation of that fundamental right, the Court declared the statute unconstitutional, notwithstanding some unavoidable intrusion into the prerogatives of the State Legislature.

The Court in *Nixon*, relying on *Baker*, declined to review the constitutionality of the United States Senate's delegation of an impeachment trial to a committee. Thus, the *Nixon* Court recognized the propriety of judicial review, when confronted with a statutory violation of a fundamental right, such as was at stake in *Baker*, and the propriety of judicial restraint, when contemplating the internal operation of another branch of government that does not impinge on such a right. So here, this Court can stand ready to review legislation that transgresses "bedrock principles of representative democracy" and still refrain from reviewing the internal operations of the New Jersey Senate in the confirmation process. It follows that even an internal Senate practice is subject to judicial review if that practice results in the violation of fundamental rights. As vital as judicial independence is to a democracy, non-tenured judges do not enjoy an unqualified right to reappointment.

Distressing though senatorial courtesy may be, particularly when exercised on a sitting judge, it remains a prerogative of the

Senate. If we were senators, we might well join those who urge the abolition of senatorial courtesy on judicial reappointments. The separation of powers, however, requires that courts not interfere with Senate prerogatives except when fundamental rights are at stake. Admittedly, the distinction leaves undefined the zone in which senatorial courtesy is subject to judicial review. The test of respect for another branch of government, however, lies in judicial restraint not when a court agrees with that branch, but when it disagrees.

## VII

At oral argument, which was held before the General Election on November 2, defendants urged the Court to exercise judicial restraint. They argued that the remedy for the exercise of senatorial courtesy is not in this Court, but in the court of public opinion. The import of the argument is that voters can refuse to reelect a senator who exercises senatorial courtesy. Indeed, Senator Dorsey's exercise of senatorial courtesy generated considerable public interest and became a major issue in his unsuccessful campaign for reelection. Peggy Wright, *MacInnes Dumps Dorsey*, Daily Record, Nov. 3, 1993, at 1; Brian T. Murray, *Battle Over Judges Replayed in Senate Race*, Star–Ledger, Oct. 10, 1993, at 18. That eventuality, however, plays no part in our belief that the political process provides an effective remedy without judicial intervention.

Over one-hundred years ago, Professor James B. Thayer stated the case for judicial restraint:

[T]he safe and permanent road towards reform is that of impressing upon our people a far stronger sense than they have of the great range of possible harm and evil that our system leaves open, and must leave open, to the legislatures, and of the clear limits of judicial power; so that responsibility may be brought sharply home where it belongs. The checking and cutting down of legislative power, by numerous detailed prohibitions in the constitution, cannot be accomplished without making the government petty and incompetent.... Under no system can the power of courts go far to save a people from ruin; our chief protection lies elsewhere.

[*The Origin and Scope of the American
Doctrine of Constitutional Law,* 7
*Harv.L.Rev.* 129, 156 (1893).]

Echoing those words, Judge Learned Hand stated:

this much I think I do know—that a society so riven that the spirit of moderation is
gone, no court *can* save; that a society where that spirit flourishes, no court *need*
save; that in a society which evades its responsibility by thrusting upon the courts
the nurture of that spirit, that spirit in the end will perish.

[*The Contribution of an Independent Judiciary to Civilization
in the Spirit of Liberty: Papers and Address of Learned
Hand* 172, 181 (Irving Dillard ed. 1951).]

Sometimes, the hardest decision is the decision not to decide.
Yet the decision not to decide is at the core of judicial restraint.
Ultimately, the responsibility for judicial independence rests in the
hands of the people. A court must stay its hand if the public and
its elected representatives are to assume their responsibilities for
an independent judiciary.

Justices CLIFFORD and GARIBALDI join in this concurrence.

HANDLER, J., concurring in part and dissenting in part.

At issue in this case is the constitutionality of senatorial courte-
sy, a practice that allows a single senator who resides in or
represents any portion of the county in which a nominee is
domiciled to veto the appointment without further action by the
Senate. Most recently, the practice of senatorial courtesy was
threatened to block the reappointment of Judge Marianne Espino-
sa Murphy to the Superior Court. This suit was filed challenging
the constitutionality of the practice of senatorial courtesy and its
attempted exercise with respect to Judge Murphy's nomination.

■ I conclude that the practice of senatorial courtesy is uncon-
stitutional when the ultimate effect of its exercise is to veto a
gubernatorial appointment without further action by the Senate.
Senatorial courtesy directly violates the State Constitution be-
cause it authorizes the exercise of the confirmation power by a

single Senator. Nevertheless, in this case, the Senate did not exercise its confirmation power through senatorial courtesy but acted collectively as a legislative body in rejecting the nomination of Judge Murphy for reappointment. Consequently, although I disagree with the determination of the trial court and my concurring colleagues that this case is nonjusticiable, because Judge Murphy's nomination was rejected by the entire Senate, I concur in the judgment to dismiss the complaint.

## I

The concurring opinion and the trial court express the view that this case presents a nonjusticiable issue. That issue, most broadly stated, is whether courts have the authority to adjudicate a challenge to the constitutionality of the practice of senatorial courtesy and whether that practice is implicated by Senate action that rejects a judicial nomination. In my opinion, the constitutional doctrine of separation of powers, which enjoins deference by the judiciary toward the exercise of the powers vested in the other branches of government, does not, in the circumstances of this case, insulate this legal challenge from judicial review.

## A.

As suggested by our decision in *Gilbert v. Gladden*, 87 *N.J.* 275, 432 *A.*2d 1351 (1981), the question of justiciability truly lies at the end and not at the beginning of the analysis. *Id.* at 282, 432 *A.*2d 1351. The merits of the controversy in this case are inextricably intertwined with the issue of justiciability, and consequently consideration of justiciability requires simultaneous consideration of the merits of the issue in dispute.

### 1.

The United States Supreme Court in *Baker v. Carr*, 369 *U.S.* 186, 82 *S.Ct.* 691, 7 *L.Ed.*2d 663 (1962), set forth a comprehensive standard for determining the justiciability of apparent political questions:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

[*Id.* at 217, 82 *S.Ct.* at 709, 7 *L.Ed.*2d at 686.]

*Baker* has guided this Court in determining issues of justiciability. *Gladden, supra,* 87 *N.J.* at 275, 432 *A.*2d 1351. Under that standard, the analysis commences with the text of the State Constitution itself to determine initially whether the disputed governmental function, the confirmation power, has been vested in a particular branch of government and whether its exercise is subject to ascertainable and understandable standards imparted by the text of the Constitution.

Article six, section one, paragraph one, the Advice and Consent Clause of the New Jersey Constitution, states: "The Governor shall nominate and appoint, with the advice and consent of the Senate." The text of the Constitution clearly commits the power of confirmation to the Senate. However, contrary to the suggestion of the concurring opinion, *ante* at 430, 634 *A.*2d at 498, the commitment of a power to another branch of government is not determinative of the claim of nonjusticiability, and does not end the inquiry. The necessary, further question is whether the Constitution, in making the commitment of a governmental power, itself affords standards that serve to limit or guide its exercise. As noted in *Nixon v. United States,* 506 *U.S.* ——, ——, 113 *S.Ct.* 732, 735, 122 *L.Ed.*2d 1, 9 (1993), "the concept of a textual commitment ... is not completely separate from the concept of a lack of judicially discoverable and manageable standards."

The salient inquiry is whether in committing the power to confirm gubernatorial nominations to the Senate, the constitutional text contains "judicially discoverable and manageable standards

for resolving [the question]." *Baker, supra,* 369 *U.S.* at 216, 82 *S.Ct.* at 709, 7 *L.Ed.*2d at 686. The discovery of such standards is crucial to the issue of justiciability for, as we noted in *Gladden,* "in the absence of constitutional ... standards, it is not the function of this Court to substitute its judgment for that of the Legislature." 87 *N.J.* at 282, 432 *A.*2d 1351.

The nature of a court's search for manageable standards was usefully illustrated by the decisions of the United States Supreme Court in *Powell v. McCormack,* 395 *U.S.* 486, 89 *S.Ct.* 1944, 23 *L.Ed.*2d 491 (1969), and, most recently, in *Nixon, supra,* 506 *U.S.* at ——, 113 *S.Ct.* at 732, 122 *L.Ed.*2d 1, and by our Court in *Gladden, supra,* 87 *N.J.* at 275, 432 *A.*2d 1351.

In *Powell, supra,* the Supreme Court held justiciable a dispute between the leaders of the United States House of Representatives and an elected representative, Adam Clayton Powell, Jr., over the qualifications necessary for being seated in the 90th Congress. The Supreme Court determined that the United States Constitution contained a textual commitment of the issue to the House in article I, section five, which empowers the House to "be the Judge of the Qualifications of its own Members." 395 *U.S.* at 548, 89 *S.Ct.* at 1978, 23 *L.Ed.*2d at 532. Further, the Supreme Court found that the commitment was subject to express standards set forth in the constitutional text itself concerning House membership. Because those standards could be reviewed and applied by the Court, the issue in dispute was justiciable.

In *Nixon, supra,* the Supreme Court considered whether United States Senate Rule XI, which allows United States Senate Committees to hear evidence against impeached persons, violated the Impeachment Clause. The Impeachment Clause, article 1, section 3, clause 6, provides: "the Senate shall have the sole Power to try all Impeachments." The Court concluded that the Federal Constitution committed the impeachment power to the Senate, and, further, that the text disclosed no manageable standard for resolving the specific question before it, namely, whether fact-finding in an impeachment procedure was required to be

made by the Senate as a whole or could be delegated to a Senate Committee. 506 *U.S.* at ——, 113 *S.Ct.* at 740, 122 *L.Ed.*2d at 14. Determination of the disputed question turned on the meaning of the constitutional term "try." The Court refused to resolve the disputed issue of fact-finding in an impeachment proceeding by implying limiting standards to qualify the word "try" because the Impeachment Clause contained other specific express limitations on the Senate's impeachment power, *i.e.*, the members must be under oath, a two-thirds vote is required to convict, and the Chief Justice presides when the President is tried. *Id.* at ——, 113 *S.Ct.* at 736, 122 *L.Ed.* at 10. The Court also determined that the term "try" had no fixed meaning that would afford manageable judicial standards for determining how an impeachment case was required to be tried by the Senate and accordingly concluded that the interpretation of the term "try" must have been committed to the Senate. Thus the specific issue in dispute was nonjusticiable.

This Court took much the same approach in *Gladden, supra*, 87 *N.J.* at 275, 432 *A.*2d 1351. There the Court considered the "Presentment" Clause of article III, paragraph one, of the State Constitution. The specific dispute related to the practice of "gubernatorial courtesy," whereby bills that have passed both houses are not presented to the Governor for signature until the Governor so requests; as a result those bills could be withheld from gubernatorial action and allowed to lapse. The Court found that the Constitution had committed the power of presentment to the Legislature. Further, because the Constitution contained no textual standard with respect to the timing of presentments to the Governor, the issue of timing itself had been "textually committed" to the Legislature as well and therefore was nonjusticiable. *Id.* at 283, 432 *A.*2d 1351.

The primary lesson of those decisions is that the analysis of justiciability concentrates initially and primarily on whether the subject-matter of the dispute has been constitutionally committed to another branch of government and whether practicable standards governing that subject-matter can be derived from the

constitutional text. A court can carry out that analysis properly only when it relates to the specific issue in dispute and the constitutional text that addresses that issue. In this case, therefore, we must limit our analysis to whether a single Senator by disapproving a gubernatorial nomination can exercise the Senate's confirmation power, and to the exact constitutional text that relates to that issue.

2.

Constitutional interpretation, like statutory construction, commences with an unconstrained and sensible reading of the relevant language. Where that reading reveals language that has a plain meaning, one derived from ordinary usage and understanding based on common experience, courts need not resort to extrinsic aids or look at outside sources. *See Vreeland v. Byrne*, 72 *N.J.* 292, 302, 370 *A.*2d 825 (1977). In such a case, "we inquire as to the meaning [that] the symbols of expression would most naturally and plainly convey [ ] the sense most obvious to the common understanding." *Gangemi v. Berry*, 25 *N.J.* 1, 16, 134 *A.*2d 1 (1957).

In the context of the specific dispute posed by this case, the key term of the Advice and Consent Clause is "Senate." According to the constitutional text, the Governor nominates and appoints; the *Senate* advises and consents. A plain meaning can be ascribed to the term "Senate." The meaning of "Senate" that is conveyed by ordinary usage and common understanding is a multi-member legislative body that acts collectively to exercise its constitutional powers and perform its allotted governmental functions.

The principle of collectivity is derived from the fact that the Senate is a multi-member "body" or house of a bicameral legislature. *See The Federalist Papers* No. 67, at 410 (Alexander Hamilton) (Clinton Rossiter ed., 1961) (hereinafter *Federalist Papers* ). A "Legislature" is commonly understood to be "[t]he department, assembly, or body of persons that makes statutory laws for a state or nation." *Black's Law Dictionary* 811 (5th ed. 1979); *see In re Hague*, 105 *N.J.Eq.* 134, 147 *A.* 220 (Ch.1929)

(noting that legislature is "the lawmaking body of the state"), *aff'd, Ex parte Hague,* 123 *N.J.Eq.* 475, 150 *A.* 322 (E. & A.1930). Courts have interpreted the term "legislature" to denote a multi-member entity that acts collectively. *See, e.g., State ex rel. Carroll v. Becker,* 329 *Mo.* 501, 45 *S.W.*2d 533, 536 (The legislature is "a political body of persons. Appropriately, it could not mean merely the members of that body."), *aff'd,* 285 *U.S.* 380, 52 *S.Ct.* 402, 76 *L.Ed.* 807 (1932); *Commonwealth v. Hall,* 291 *Pa.* 341, 140 *A.* 626, 630 (1928) (observing that the legislature is "a body to declare public policy of state").

The principle of collectivity is further derived from the legislature's representative relationship to the people. That representative responsibility of the Senate as a legislative body is at the heart of republican government. The United States Supreme Court described "state legislatures ... [as] the fountainhead of representative government in this country" and pointedly observed, "Representative government is in essence self-government through the medium of elected representatives of the people." *Reynolds v. Sims,* 377 *U.S.* 533, 564, 84 *S.Ct.* 1362, 1383, 12 *L.Ed.*2d 506, 528–29, *reh'g denied,* 379 *U.S.* 870, 85 *S.Ct.* 12, 13 *L.Ed.*2d 76 (1963). Because legislatures, under our republican form of government, "should be bodies which are collectively responsible to the popular will," *id.* at 565, 84 *S.Ct.* at 1383, 12 *L.Ed.*2d at 529, they should be a large-enough "chosen body of citizens" to "guard against the cabals of a few." *Federalist Papers, supra,* No. 10, at 82 (James Madison). Constitutional wisdom demands that a legislature's public trust "should be placed not in a few, but in a number of hands." *Federalist Papers, supra,* No. 37, at 227 (James Madison).

Legislative power in all its forms rests fundamentally on the legislature's representative nature. *See Gangemi, supra,* 25 *N.J.* at 8–9, 134 *A.*2d 1. "Legislative power" must, therefore, be exercised "by an assembly." *Federalist Papers, supra,* No. 83, at 509 (Alexander Hamilton). A legislature's collective responsibility, however, attaches not only to the enactment of legislation. It

applies as well to its power to confirm gubernatorial appointments of public officials who must abide by the Constitution and serve the people in discharging their prescribed governmental functions. Like the legislative power itself, the Senate's confirmation power is integral to the basic structure and logic of our republican form of government. That power, which serves as "a check upon [the executive] to prevent bad appointments," "is one of the most delicate and difficult subjects" in the constitutional apportionment of vital governmental responsibilities. New Jersey Writers' Project, *Proceedings of the New Jersey State Constitutional Convention of 1844* 356, 360 (1942). It can be "the surest guarantee of fidelity that can be afforded to the people." *Id.* at 382. The confirmation power must, therefore, be exercised, in contrast to the executive's appointive powers, by "a different and independent body[, which] is an entire branch of the legislature." *Federalist Papers, supra,* No. 76, at 457–58 (Alexander Hamilton); *see Marbury v. Madison,* 5 *U.S.* (1 Cranch) 137, 155–56, 2 *L.Ed.* 60 (1803). The confirmation power under the State Constitution "mandates the *Senate* (not just one member) ... pass on the qualifications of nominees for State office." *Senatorial Courtesy: A Public Outrage,* 112 *N.J.L.J.* 313 (Sept. 22 1983) (editorial).

Accordingly, the meaning of the term "Senate" as used in the Advice and Consent Clause of the State Constitution reflects the Senate's inherent nature as a legislative body. The very legitimacy of the Senate as a constitutional actor is premised on its representative nature, and the validity of its actions, in turn, requires that it act collectively as a body with respect to the exercise of its constitutional powers.

The concurring opinion states that the term "Senate" cannot be invested with a meaning that requires collective action as a legislative body. It believes that *Nixon* supports that conclusion. *Ante* at 433–436, 634 *A.*2d at 500–501. I disagree.

The Supreme Court in *Nixon, supra,* found no standard in the constitutional text that would require the Senate as a whole to perform the specific function of fact-finding as an incident to the

exercise of the impeachment power. Accordingly, it refused to interpret "Senate" to require that the whole Senate undertake fact-finding as a basis for impeachment or to read into the word "Senate" a specific limitation barring the delegation of particular incidental impeachment functions. 506 *U.S.* at ——, 113 *S.Ct.* at 732, 122 *L.Ed.*2d at 11. The Supreme Court made not the slightest suggestion in *Nixon* that the ultimate exercise of the impeachment power could be undertaken without collective action by the entire Senate or that the validity of such action would not be subject to judicial review. Thus, as pointed out by Justice White, concurring in *Nixon*, "[w]ere the Senate, for example, to adopt the practice of automatically entering a judgment of conviction whenever articles of impeachment were delivered from the House, it is quite clear that the Senate will have failed to 'try' impeachments." 506 *U.S.* at ——, 113 *S.Ct.* at 744, 122 *L.Ed.*2d at 20. The fact is, in *Nixon*, the entire Senate undertook to exercise directly its impeachment authority.[1]

Consistent with the analysis invoked in *Nixon*, the Advice and Consent Clause of the State Constitution has no express limitations with respect to any aspect of the exercise of the Senate's confirmation powers that militate against invoking a standard derived from the commonsense and natural meaning of the term "Senate," namely, a legislative body that must act collectively through its members in performing its governmental functions. That standard would not foreclose the Senate from adopting ancillary rules for procedures that would authorize the delegation of functions incidental to the ultimate exercise of its confirmation powers. That standard, however, would foreclose the ultimate exercise of the confirmation power without full Senate action.

---

[1] In *Nixon*, the full Senate was presented with a report and complete transcript of the proceedings, a well as with extensive final briefs. Three hours were allotted for oral argument on the Senate floor. The Senate voted to convict Judge Nixon on two articles by more than the mandatory two-thirds vote. 506 *U.S.* at ——, 113 *S.Ct.* at 735, 122 *L.Ed.* at 8.

The trial court's conclusion, apparently endorsed by the concurrence, *ante* at 436–437, 634 *A*.2d at 501, that the constitutional history of the Senate's confirmation powers demonstrates approval of the practice of senatorial courtesy, poses a further issue. As a settled matter of constitutional interpretation, a court need go no further than the text when the text itself affords a clear and sensible meaning that can be ascribed to the Constitution. Nevertheless, fairly read, the constitutional history surrounding the enactment of the Advice and Consent Clause is much too general and uncertain to support the conclusion that senatorial courtesy, which eliminates action by the full Senate and sanctions the exercise of the Senate's confirmation power by a single Senator, was adopted as a constitutional principle.

The Senate's confirmation power was first created under the 1844 Constitution. Although the 1844 framers were at least aware of the practice of senatorial courtesy based on federal experience, *Passaic County Bar Ass'n v. Hughes*, 108 *N.J.Super.* 161, 168–71, 260 *A*.2d 261 (Ch.Div.1969); *Kligerman v. Lynch*, 92 *N.J.Super.* 373, 375–76, 223 *A*.2d 511 (Ch.Div.1966), *cert. denied*, 389 *U.S.* 822, 88 *S.Ct.* 49, 19 *L.Ed*.2d 74 (1967); *see* Joseph P. Harris, *The Advice and Consent of the Senate* 40 (1953); Michael J. Feehan, Comment, *The Role of Advice and Consent: Senatorial Discourtesy*, 10 *Seton Hall L.Rev.* 117, 120 (1979) (hereinafter *Senatorial Discourtesy* ), nothing indicates that the practice was actually considered or discussed when that Constitution was adopted. *Senatorial Courtesy, supra,* 15 *Rutgers L.J.* at 984.

The history surrounding the current Constitution is also problematic. The State Constitution that was proposed in 1944 included a provision abolishing senatorial courtesy. The proposed constitution was defeated by the citizens, without any evident focus or emphasis on the Senate's confirmation power. Further, in 1947, when the Constitutional Convention met again, "senatorial courtesy was not widely discussed at the convention." *Senatorial Discourtesy, supra,* 10 *Seton Hall L.Rev.* at 131. The Convention's discussions tended to focus on whether to impose time constraints

on the Legislature's exercise of advice and consent. *See ante* at 436, 634 *A.*2d at 501. The delegates never squarely confronted the issue of whether to endorse or even to condemn the practice of senatorial courtesy. Thus, one cannot soundly conclude that the constitutional framers somehow approved, ratified, or adopted the exercise of senatorial courtesy as a constitutional tenet.

The principal test used in the analysis of justiciability—whether the constitutional text commits an issue to another branch of government without judicially discoverable and manageable standards—is met in this case. Such a standard governing the exercise of the Senate's confirmation power is derived from the plain meaning of the term "Senate." That standard imposes a minimum requirement for the exercise of the confirmation power: collectivity. Importantly, that standard, although general, is not so vague as to be unmanageable. As the concurring opinions in *Nixon* illustrate, a standard applicable to a specific governmental function may in some instances impose only minimal requirements for its exercise, while leaving unconstrained other aspects of the more general governmental power. *E.g., Nixon, supra,* 506 *U.S.* at —, 113 *S.Ct.* at 744, 122 *L.Ed.*2d at 20 (White, J., concurring); *id.* at —, 113 *S.Ct.* at 748, 122 *L.Ed.*2d at 24 (Souter, J., concurring).

Further, the dispute in this case is not rendered nonjusticiable under the other criteria of the justiciability doctrine. An adjudication of that issue in this case would not engender a potential for "embarrassment from multifarious pronouncements by various [governmental] departments." *Baker, supra,* 369 *U.S.* at 216, 82 *S.Ct.* at 709, 7 *L.Ed.*2d at 686. Nor would there be any "unusual need for unquestioning adherence to a political decision already made." *Ibid.* Although the subject matter is sensitive and controversial, a judicial determination regarding senatorial courtesy according to a constitutional standard would not be "of a kind clearly for nonjudicial discretion." *Ibid.* Finally, the determination that the confirmation power requires collective action by the Senate as a whole according to a constitutional standard would in

no way signify a "lack of respect due coordinate branches of government." *Ibid.*

In sum, the standard of collectivity derived from the Advice and Consent Clause requires only that at some point in the life of a nomination the entire Senate as a legislative body must manifest collectivity when it takes final action on the nomination. In light of that standard, the specific issue in dispute in this case is amenable to judicial review and satisfies the criteria for justiciability.

3.

■ The concurring opinion is comfortable with the view that the Senate's exercise of its confirmation powers is never the business of judges and is best left to the Senate. *Ante* at 429, 634 *A.*2d at 498. Yet it concedes that if the exercise of that power is sufficiently egregious, it can be subject to judicial review. *Ante* at 438, 634 *A.*2d at 502. The concurrence also illustrates its point by referring to the observation of Justice Souter, concurring in *Nixon,* that "[i]f the Senate were to act in a manner seriously threatening the integrity of its results, convicting, say, upon a coin-toss, or upon a summary determination that an officer of the United States was simply a 'bad guy', judicial interference might well be appropriate." *Id.,* 506 U.S. at ——, 113 *S.Ct.* at 748, 122 *L.Ed.*2d at 24. The concurrence does not explain why the practice of senatorial courtesy that results in the final rejection of a gubernatorial nomination by a single Senator is not an egregious distortion of the Senate's confirmation powers or does not threaten the integrity of the constitutional scheme for judicial nominations.

Further, the relatively few cases dealing with the governmental appointive powers do not demonstrate that the issue of senatorial courtesy is nonjusticiable: *Loigman v. Trombadore,* 228 *N.J.Super.* 437, 550 *A.*2d 154 (App.Div.1988); *Passaic County Bar Ass'n, supra,* 108 *N.J.Super.* at 161, 260 *A.*2d 261; and *Kligerman, supra,* 92 *N.J.Super.* at 373, 223 *A.*2d 511. Although those decisions are instructive, they nevertheless are distinguishable and

do not support the conclusion that the challenge to senatorial courtesy presented in this case is nonjusticiable.

*Loigman, supra,* concerned a suit to prevent the Governor from soliciting information about potential judicial nominees from the State Bar Association. 228 *N.J.Super.* at 437, 550 *A.*2d 154. The court first scrutinized the text of article VI, Section VI, paragraph 1 of the New Jersey Constitution. It determined that the issue had been committed to the Governor and that the constitutional text did not impose any restrictions on the sources of information the Governor might use in considering a judicial nominee. *Id.* at 443, 550 *A.*2d 154. Accordingly, it concluded that the dispute was nonjusticiable.

*Kligerman, supra,* addressed the issue of whether reasons were required in the exercise of the Senate's confirmation power. 92 *N.J.Super.* at 373, 223 *A.*2d 511. The court determined that the text of the Advice and Consent Clause offered no guidance on the substantive basis for the exercise of the Senate's confirmation power. It found that "the mere act of confirmation or rejection by the Senate, for whatever reasons and in whatever manner, is sufficient to meet the requirements of said clause." *Id.* at 377, 223 *A.*2d 511.

The issue in this case may be distinguished from those in *Loigman* and *Kligerman.* The appeal focuses only on whether the ultimate exercise of the confirmation power must be undertaken collectively, an issue that is directly informed by a standard based on the plain meaning of the constitutional term "Senate."

Finally, in *Passaic County Bar Ass'n, supra,* the court considered senatorial courtesy in the broader context of whether the failure to exercise the Senate's confirmation power was justiciable. 108 *N.J.Super.* at 161, 260 *A.*2d 261. The court found no "judicially discoverable and manageable standard" in the Advice and Consent Clause with reference to the issue of delay. *Id.* at 173, 260 *A.*2d 261. Consequently, the court concluded that a charge that senatorial courtesy unconstitutionally delayed the process of judicial appointments was nonjusticiable. *Ibid.*

The Court, here, in contrast to *Passaic County Bar Ass'n,* addresses neither a case in which the Senate has taken no action whatsoever with respect to a gubernatorial judicial appointment nor a situation in which the Senate simply chooses to delay taking action. Concededly, at times a court may encounter difficulty in identifying whether it is confronted with Senate inaction or merely with delay with respect to judicial nominations. *Ante* at 432, 634 *A.*2d at 499. However, this case does not present such a predicament because the Senate's vote on the motion that foreclosed further consideration of the nomination constituted not simply inaction or delay but final action rejecting the nomination by the entire Senate.

### B.

Defendants also contend that senatorial courtesy is beyond review by the judiciary because it constitutes an internal rule of procedure. In my view, the practice of senatorial courtesy can be subject to judicial review because it does not devolve from the constitutional right of each house of the Legislature to "determine the rules of its proceedings." *N.J. Const.* art. IV, § 4, cl. 3. *See, e.g., Gladden, supra,* 87 *N.J.* at 275, 432 *A.*2d 1351 (acknowledging that unwritten practice of gubernatorial courtesy that could result in "pocket veto" of legislative bills was tantamount to legislative rule or procedure).

Courts readily acknowledge the breadth of legislative rulemaking governing internal legislative procedures. *E.g., Reilly v. Ozzard,* 33 *N.J.* 529, 166 *A.*2d 360 (1960); *In re Ross,* 86 *N.J.L.* 387, 391, 94 *A.* 304 (Sup.Ct.1914); *State v. Rogers,* 56 *N.J.L.* 480, 631, 28 *A.* 726 (Sup.Ct.1884); *Gewertz v. Joint Legislative Comm.,* 132 *N.J.Super.* 435, 334 *A.*2d 64 (App.Div.), *certif. denied,* 68 *N.J.* 156, 343 *A.*2d 444 (1975); *see Parker v. Merlino,* 646 *F.*2d 848, 854–55 (3rd Cir.1981). Because a practice reflects a legislative rule or procedure does not mean, however, that application of the rule or procedure is immune from judicial review. A legislative procedural rule is subject to judicial review if "there is an obvious

violation of fundamental rights." *In re Lamb,* 67 *N.J.Super.* 39, 59, 169 *A.*2d 822 (App.Div.), *aff'd,* 34 *N.J.* 448, 170 *A.*2d 34 (1961). As stated in *Rogers, supra,* 56 *N.J.L.* at 616, 28 *A.* 726, "[W]hen the inquiry is whether the legislature or any other body or officer has violated the regulations of the constitution it is entirely plain that the decision of that subject must rest exclusively within the judicial department of the government." *See Parker, supra,* 646 *F.*2d at 855; *Wilentz ex rel. Golat v. Stanger,* 129 *N.J.L.* 606, 617, 30 *A.*2d 885 (E. & A.1943).

In this case, however, the specific issue is whether the actions taken by the Senate with respect to Judge Murphy's nomination were inconsistent with the constitutional standard that the confirmation power must be exercised collectively by the Senate as a legislative body. That issue cannot escape judicial review simply because the action of the Senate allegedly conformed to an internal rule of procedure.

## C.

The exercise of senatorial courtesy is not immune from judicial review under the Speech and Debate Clause of the State Constitution, a proposition contested by defendants. That clause provides that "for any statement, speech or debate in either house or at any meeting of a legislative committee [legislators] shall not be questioned in any other place." *N.J. Const.* art. I, cl. 6.

In *Van Riper v. Tumulty,* 26 *N.J.Misc.* 37, 56 *A.*2d 611 (Sup.Ct. 1948), the court held that an Assemblyman's statements in a resolution before the Judiciary Committee of the General Assembly had been privileged as "speech or debate." Similarly, in *Cole v. Richards,* 108 *N.J.L.* 356, 158 *A.* 466 (E. & A.1932), the Speech and Debate Clause immunized a State Senator from a slander action for his statement on the Senate floor charging an attorney with forging the Senator's name to court papers. The clause was also found to immunize a state legislator from liability for damages in a civil suit under the federal Civil Rights Act. *Gewertz v. Jackman,* 467 *F.Supp.* 1047 (D.D.C.1979); *see also Lake Country*

*Estates, Inc. v. Tahoe Regional Planning Agency,* 440 *U.S.* 391, 99 *S.Ct.* 1171, 59 *L.Ed.*2d 401 (1979) (holding state legislators immune from federal damage liability under state Speech and Debate Clause).

However, the immunity of the Speech and Debate Clause is not absolute. *See, e.g., In re Grand Jury Proceedings (Cianfrani),* 563 *F.*2d 577, 580–81 (3rd Cir.1977) (finding state legislators not immune under federal Speech and Debate Clause for criminal conduct prohibited by congressional acts); *State v. Gregorio,* 186 *N.J.Super.* 138, 152–53, 451 *A.*2d 980 (Law Div.1982) (holding that state Speech and Debate Clause was no defense to indictment of legislator for submission of false financial-disclosure statements).

The issue of the validity of the exercise of senatorial courtesy in this case does not implicate the privilege accorded to legislators under the Speech and Debate Clause. The Court in determining that issue need not concern itself at all with any "integral part of the deliberative and communicative process" of the Senate, *see Gravel v. United States,* 408 *U.S.* 606, 625, 92 *S.Ct.* 2614, 2627, 33 *L.Ed.*2d 583, 602 (1972), or probe the motivations behind individual or collective Senate conduct. Rather, the issue presented requires a judicial determination limited to only whether certain action taken by or attributable to the Senate is valid as measured by a constitutional standard that governs that action.

### D.

In summary, the issue in dispute in this case—the constitutionality of the Senate's rejection of Judge Murphy's nomination based on Senator Dorsey's assertion of senatorial courtesy and subsequent Senate action to foreclose consideration of the nomination—is justiciable; and, further, the issue is not immunized from judicial review by other provisions of the State Constitution protecting internal legislative rules of procedure and legislative prerogatives of speech and debate.

Under our Constitution, the Senate is granted the power of advice and consent with regard to gubernatorial nominations,

including judicial nominations. The constitutional text of the confirmation power uses the term "the Senate," which has a plain meaning and imports a definitional standard that is applicable to the exercise of that power. That standard denotes that the exercise of the confirmation power with respect to judicial nominations requires collective action by the Senate as a whole in its capacity as a legislative body.

## V

Our concurring colleagues contend that the Senate as a whole failed to act formally to reject the nomination of Judge Murphy because its vote on a motion that would have referred the nomination to the Senate Judiciary Committee, Senate Resolution 99 (*S.Res.* 99), did not constitute final action. *Ante* at 437–438, 634 *A.*2d at 502. I disagree.

The concurrence reasons that because approval of the reference motion would not itself constitute a confirmation of Judge Murphy's nomination, the disapproval of the motion cannot constitute a rejection of the nomination. *Ante* at 438, 634 *A.*2d at 502. That assessment of the Senate's action does not square with the reality.

The record reveals that on July 27, 1993, Senator Lesniak introduced *S.Res.* 99. The resolution directed the Senate Judiciary Committee to schedule a committee meeting to consider the reappointment of Judge Murphy on or before August 23, 1993, and to forward its recommendations concerning the reappointment to the full Senate on or before September 1, 1993.

On August 16, 1993, Senator Lesniak made a motion to have the full Senate pass on *S.Res.* 99, under Senate Rule 128, which permits a resolution to be taken up as an "order of a particular day, on which day it shall be taken up, whether or not it is upon the Calendar for said day, in preference to any other whether or not they are on the Calendar." *Fitzgerald's Legislative Manual, State of New Jersey* 327 (1993). Senate President DiFrancesco ruled out of order the motion to advance *S.Res.* 99. Senator

Lesniak then moved to appeal the ruling of Senate President DiFrancesco on the Senate floor under Senate Rule 21, which authorizes the Senate President to "decide questions of order without debate, subject to an appeal to the Senate." *Id.* at 308. That motion to overturn the Senate President's order failed by a vote of 12–22. The Senate did not again consider Judge Murphy's nomination.

The content of the reference motion itself demonstrates clearly that its disapproval would effectively be the death-knell of the nomination. Further, as Senator Dorsey stated, the Senate clearly understood that its rejection of the reference motion meant the defeat of Judge Murphy's nomination. Thus, the action by the Senate on the reference motion, though procedural in form, had the effect of vetoing the nomination. That effect was a final rejection of the nomination because no further steps by the Senate were required to end consideration of the nomination. Because that action was taken by the Senate as a whole and it was final in its effect on the nomination, it meets the basic constitutional standard for the exercise of the advice and consent power.

The concurring opinion decries the fact that the Court cannot know the reasons that may have actuated the Senate, and therefore the Senate's disapproval of the reference motion cannot be considered an action on the nomination. *Ante* at 437, 634 *A.*2d at 502.

The constitutional text is utterly silent with respect to whether consideration of the merits of a gubernatorial nomination or the expression of reasons are essential to the exercise of the confirmation power. Thus, the Court cannot undertake to decide whether the Senate in a given case actually considered a nomination on its merits or invoked any substantive standards or had adequate reasons in taking action that has the effect of blocking such a nomination. *See Kligerman, supra,* 92 *N.J.Super.* at 373, 223 *A.*2d 511 (determining that rejection of judicial nomination for personal reasons attributable to one Senator presented nonjusticiable dispute because only way to answer question raised would be

to delve into thought process of each Senator voting against nomination to determine basis for rejection). In this case, the Senators who voted may not have fully understood or appreciated the constitutional significance of their votes as an actual exercise of the Senate's confirmation power. Nevertheless, that circumstance does not warrant a determination that the Senate's action should be characterized as merely procedural, and therefore ineffective as a final rejection of the nomination by the Senate as a whole.

That is not to say that if the Senate in the exercise of its confirmation powers rejected a gubernatorial nomination for invidious reasons, such as those delineated in our Law Against Discrimination, *N.J.S.A.* 10:5–1 to –12, our courts would be helpless to respond. The courts would have an obligation to act in the matter, an obligation devolving directly from the Constitution itself. *See, e.g., Peper v. Princeton Univ. Bd. of Trustees,* 77 *N.J.* 55, 389 *A.*2d 465 (1978); *Booker v. Bd. of Educ.,* 45 *N.J.* 161, 174, 212 *A.*2d 1 (1965). Indeed, at oral argument, counsel for defendants at oral argument conceded that Senate action based on such reasons would be cognizable by the courts. Further, the concurrence acknowledges that an exercise of the confirmation power that violates fundamental rights would be subject to judicial review. *Ante* at 439–441, 634 *A.*2d at 503–504.

We are not confronted, in this case, however, with conduct by the Senate actuated by constitutionally-base reasons. The Court, therefore, cannot otherwise inquire into the adequacy of the reasons that may in fact have prompted the Senate's determination to scuttle Judge Murphy's nomination. The power of advice and consent is that of the Senate, which constrains this Court to limit its inquiry only to whether the Senate in a given case acts in accordance with the basic standard of collective action governing the exercise of that power. To do more would violate the delicate balance envisioned by the framers of the State Constitution.

The Acting Attorney General has taken the position that the Senate's refusal to act on Judge Murphy's nomination is invalid

because senatorial courtesy is an improper delegation of the senatorial confirmation power to a single Senator. He stresses that the power of the Senate as a whole to override senatorial courtesy does not rectify its exercise. In other contexts the mere existence of a residual power, which remains unexercised, cannot otherwise validate an unconstitutional exercise of that power. *See, e.g., General Assembly v. Byrne,* 90 *N.J.* 376, 448 *A.*2d 438 (1982) (holding that retained power by legislature to enact legislation to overrule administrative regulations did not validate the improper exercise of that power by joint resolution); *In re Karcher,* 190 *N.J.Super.* 197, 210, 462 *A.*2d 1273 (App.Div.1983) (finding as violative of bicameralism an attempt by legislature to entrust subcommittee with ability to act for legislature), *aff'd in part and rev'd in part,* 97 *N.J.* 483, 479 *A.*2d 403 (1984); *see also Inganamort v. Borough of Fort Lee,* 72 *N.J.* 412, 371 *A.*2d 34 (1977) (ruling that although municipality had power to pass rent-control legislation by ordinance—complete with notice and public hearing—it could not simply extend existing rent-control legislation by resolution).

In this case, however, the reserved power of the Senate to act directly in the face of senatorial courtesy did not remain unexercised. Rather, the Senate acted collectively in its determination not to consider the nomination. The Court, therefore, is not confronted with a traditional exercise of senatorial courtesy in which the rejection of the nomination is based solely on the disapproval of that nomination by a single Senator without further Senate action.

In sum, the action by the Senate in refusing to adopt the motion of Senator Lesniak, which would have allowed further consideration of the nomination of Judge Murphy, effectively rejected the nomination and constituted a refusal to consent to the nomination. That action was taken by the entire Senate and constituted collective action on its part as a legislative body. It thus was a permissible exercise of the Senate's power under the Advice and Consent Clause.

## VII

The concurrence invokes the wisdom of the venerable James Bradley Thayer to explain its decision not to decide this case. *Ante* at 439, 634 *A*.2d at 503. Justice Felix Frankfurter, Thayer's intellectual heir, wrote a passionate dissent in *Baker v. Carr* expressing similar views to justify the refusal of the Court to review the thorny question of whether legislative representation violated the constitutional right to vote. He condemned an intemperate exercise of judicial review that would involve the Court in such a "political thicket." *Colegrove v. Green,* 328 *U.S.* 549, 555, 66 *S.Ct.* 1198, 1201, 90 *L.Ed.* 1432, 1436 (1946) (Frankfurter, J., concurring); *see* Alexander M. Bickel, *The Least Dangerous Branch* 35 (1962).

The views now expressed in the concurring opinion are reminiscent of Justice Frankfurter's. Just as the concurrence believes judicial review in this case would be intemperate and doubts the existence of a basic and broad constitutional standard that can be used to gauge the validity of the Senate's exercise of its confirmation power, Justice Frankfurter doubted the capacity of the Court to find a principle to define the franchise. Such a standard—"one person, one vote"—was later announced in *Reynolds v. Sims.* 377 *U.S.* at 558, 84 *S.Ct.* at 1380, 12 *L.Ed.*2d at 525.

Over time, the view expressed by Justice Frankfurter has come to be read as a "sorry confession of judicial impotence," to adopt a phrase used by Justice Frankfurter to criticize the majority in *Baker, supra,* 369 *U.S.* at 270, 82 *S.Ct.* at 739, 7 *L.Ed.*2d at 716 (Frankfurter, J., dissenting); *see* John Hart Ely, *Democracy and Distrust* 121 (1980). The standard announced in *Reynolds v. Sims,* derived from bedrock principles of representative democracy, has become a hallmark of contemporary representative government. The constitutional principle of collectivity, which marks the distinctive governmental responsibility of the legislature, is similarly implicit in the logic and spirit of representative democracy.

Professor Thayer warned of "detailed prohibitions" that would result in intrusive judicial supervision of other branches of govern-

ment, rendering them "petty and incompetent." James B. Thayer, *The Origin and Scope of the American Doctrine of Constitutional Law,* 7 *Harv.L.Rev.* 129, 156 (1893). The principle of collectivity is the core of constitutionally-prescribed legislative action. It is an essential corrective against a government that would be self-serving and indifferent to the popular will. A standard based on that principle affords a generous measure of the legitimacy of legislative action. It does not, perhaps as feared by the concurrence, portend a suffocating superintendence or an intrusive meddling by the judiciary that would render government "petty and incompetent." As applied to the Senate's exercise of its advice and consent power, such a principled standard, in the words of Justice Mountain, gives meaning to one of those "great ordinances" of the Constitution, which not only sanctions but indeed requires a forthright exercise of judicial review to assure fidelity to the Constitution. *Vreeland, supra,* 72 *N.J.* at 305, 370 *A.*2d 825.

The Court should recognize its fundamental power and obligation to construe the meaning of the New Jersey Constitution. *Vreeland, supra,* 72 *N.J.* at 292, 370 *A.*2d 825. The concurrence observes that sometimes the hardest decision is the decision not to decide. *Ante* at 443, 634 *A.*2d at 505. But of course the converse is equally true—sometimes the hardest decision is the decision to decide. It is not easy to find the middle ground between judicial abnegation and judicial arrogation. It is hard to know when judicial restraint lapses into judicial passivity, just as it is to know when judicial action crosses over to judicial zeal. But the judicial responsibility to find and keep that middle ground cannot be sloughed. The enterprise of judicial review functions to ensure that governmental action remains within constitutional bounds. *General Assembly, supra,* 90 *N.J.* at 391, 448 *A.*2d 438. If one branch of government improperly exercises its constitutional powers, that exercise upsets the balance of powers among the respective branches. *N.J. Const.* art. III, ¶ 1; *see Communication Workers of Am. v. Florio,* 130 *N.J.* 439, 467, 617 *A.*2d 223 (1992).

The power of confirmation is conferred by the Advice and Consent Clause of the State Constitution to the Senate as a whole to act collectively as a legislative body with respect to the confirmation of judicial nominations. This Court should acknowledge its responsibility to make that determination and to declare the principles that express the mandate of the Constitution. It would follow, and the Court should so rule, that the Senate in its capacity as a legislative body did act in accordance with constitutional standards when it collectively rejected the nomination of Judge Murphy for reappointment. That declaration and ruling would afford the Senate a constitutional benchmark to guide in the future its exercise of the constitutional authority to advise and consent.

Accordingly, I concur in part and dissent in part from the affirmance of the judgment below.

Justices O'HERN and STEIN join in this opinion.

CLIFFORD, POLLOCK and GARIBALDI, JJ., concurring.

HANDLER, O'HERN and STEIN, JJ., concurring in part and dissenting in part.

For affirmance—CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—6

For reversal—None.